RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

BRENT JAMES NASH,

> *Plaintiff-Appellant*,

*v.*

> No. 24-1263

AUSTIN BRYCE and CALVIN TURNER, Correctional Officers, in their official and personal capacities,

> *Defendants-Appellees*.

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-10258—George Caram Steeh III, District Judge.

Argued: December 11, 2024

Decided and Filed: September 30, 2025

Before: GILMAN, READLER, and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Zachary T. Runyan, RUNYAN LAW GROUP, Saint Clair Shores, Michigan, for Appellant. Christopher Alex, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Zachary T. Runyan, RUNYAN LAW GROUP, Saint Clair Shores, Michigan, for Appellant. James E. Keathley, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

BLOOMEKATZ, J., delivered the opinion of the court in which GILMAN, J., concurred. READLER, J. (pp. 31–53), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

BLOOMEKATZ, Circuit Judge. Two corrections officers, Austin Bryce and Calvin Turner, escorted prisoner Brent Nash through a prison hallway and out into a prison yard. Upon entering the prison yard, the officers executed a takedown maneuver on Nash, throwing him to the cement and fracturing his foot in two places in the process. This appeal centers on whether that takedown maneuver was justified. Nash contends that he did nothing prior to the takedown to warrant the officers' use of force against him. The officers contend that Nash lunged away from them, causing them to panic and take him to the ground.

Most of the relevant events were captured on the prison's security videos. Relying on that video footage, a prison misconduct hearing officer found that Nash had assaulted Bryce and Turner by lunging away from them before their decision to take him down. Nash then filed suit against Bryce and Turner under 42 U.S.C. § 1983, arguing that the takedown violated his Eighth Amendment right to be free from excessive force. After discovery, the district court granted summary judgment to the defendants, holding that they were entitled to qualified immunity. In so doing, the district court made two conclusions about the factual record—that the hearing officer's factual findings from the prison misconduct hearing should have preclusive effect on the litigation, and that the prison videos blatantly contradicted Nash's testimony. We disagree with both conclusions and, relying on a corrected review of the factual record, hold that Nash has raised a genuine dispute of material fact regarding whether Bryce and Turner violated his Eighth Amendment rights. We accordingly reverse the district court's grant of summary judgment to the officers.

**BACKGROUND**

**I.     Takedown**

In April 2021, Brent Nash, a prisoner incarcerated at the St. Louis Correctional Facility in St. Louis, Michigan, got into a physical altercation with a fellow inmate. What transpired after is depicted in three surveillance videos from the facility. Because what is shown in the videos "can

be interpreted multiple ways," we construe the record as depicted by the videotapes, supplemented by deposition testimony, in the light most favorable to Nash. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

In the first video, we can see Nash smash his food tray into another inmate's head. Multiple officers, including Bryce and Turner, tackle Nash to the ground; Nash struggles against the officers, but after some time, the officers succeed in handcuffing him. With Nash's hands now handcuffed behind his back, two officers—Bryce and Turner—pull Nash up and then stand slightly behind him and on either side of him. With each officer holding one of Nash's arms, Bryce and Turner begin escorting Nash out of the room and through a hallway.

The second video shows a room in the prison known as the "dayroom." The windows of the dayroom look out into a hallway that leads to a prison yard. Through those windows, we can see that Nash, with his arms still handcuffed, is led by Bryce and Turner through the hallway to the door that leads to the prison yard. Nash walks at a normal speed, but we can tell that he is swaying slightly from side to side. It is more difficult to see what happens while Nash, Bryce, and Turner walk to the end of the hallway; the footage is blurry to begin with, and the glass windows that show the hallway appear tinted. We can see that, as Nash walks through the end of the hallway and out into the prison yard, his torso bends forward momentarily. But we cannot tell what prompted him to bend over. Nash, Bryce, and Turner then walk through the door to the outside.

The third video shows the prison yard. Nash, Bryce, and Turner exit the hallway door and enter the yard. We can't see the interaction between them as they exit the hallway into the prison yard because the camera's view of them is entirely obscured by the open door. Once Nash can be seen in the video, his footsteps appear to shuffle slightly—but we can't tell what causes his feet to shuffle. Nash's body then turns to his left, and Bryce and Turner slam him to the ground.

In their deposition testimony, Nash, Bryce, and Turner offered differing perspectives regarding the takedown incident depicted in the videos. Nash admitted that as he entered the prison hallway, he was swaying slightly back and forth, but he contended that he did not struggle

against Bryce and Turner. Nash stated that as Bryce and Turner were walking him through the hallway, they had both of their hands on his arms and had him "bent over at the waist" so that his body was at a "90-degree angle," "walking with [his] face down towards the cement." Nash Dep., R. 36-1, PageID 220. Nash testified that as he was walking in this position, the officers were also pulling at his arms and bending them up behind his back, causing him discomfort. Nash explained that, as he walked out of the hallway and into the prison yard with Bryce and Turner, he "kind of pull[ed]" his arms down to "the normal position they [were] supposed to be in," with his hands held behind his back. *Id.* at PageID 222. In reaction to Nash's moving his arms into a more neutral position, he says that Bryce and Turner took him to the ground.

Bryce and Turner, by contrast, both testified that Nash had been struggling against them before their decision to take him down, but they offered inconsistent testimony regarding what prompted their use of force. Bryce testified that as he and Turner walked through the hallway with Nash, Nash began walking faster and swearing. In response, Bryce warned Nash to "stop resisting and to slow down." Bryce Dep., R. 36-2, PageID 282. Bryce further testified that, as the three men walked through the prison hallway, Nash began swaying back and forth, causing Bryce to begin losing his grip on Nash's arm. Then, as Bryce, Turner, and Nash exited the hallway door to the prison yard, Nash "began to pull away" from Bryce and to try to turn towards him. *Id.* at PageID 280; *see also id.* at PageID 286. Bryce thought that Nash had turned to his left voluntarily, in an attempt to turn around and face Bryce. Concerned that Nash was going to spit on him, Bryce decided to take him down.

Like Bryce, Turner testified that Nash swore at the officers and then began to pull away from them as they made their way through the prison hallway. But he otherwise recalled what happened differently. He described that as he, Bryce, and Nash made their way through the hallway, Nash had been walking at a normal speed. He noted that he had had no "issues" with Nash's walking from side to side. Turner further testified that, as he and Bryce opened the door to the outside, Nash tried to pull away. Specifically, Turner stated that Nash "threw his head back," almost hitting Bryce in the face and upsetting Bryce as a result. Turner Dep., R. 36-3, PageID 352–53. Bryce then executed the takedown maneuver. Turner testified that Bryce's execution of that takedown maneuver caused Nash's body to turn to the left. So, contrary to

Bryce's testimony, Turner stated that Nash had not voluntarily turned toward Bryce, but rather had been forcibly turned as Bryce took him to the ground.

During his deposition, Turner reviewed the videos of the incident. He acknowledged that the videos did not show Nash throwing his head back towards Bryce as the three men exited the hallway and entered the prison yard. Turner suggested, however, that it was possible that the camera had not "caught" the movement because it happened so quickly. *Id.* at PageID 375–76. Turner elaborated: "The camera doesn't give a good representation of the situation." *Id.* at PageID 377.

As a result of Bryce and Turner's takedown maneuver, Nash fractured his foot in two places. He wore a cast for several weeks and a boot cast for several more as a result.

## II.    **Major Misconduct Hearing**

On the same day that Bryce and Turner took Nash to the ground, Bryce issued Nash a prison misconduct citation for two offenses: (1) assault and battery of a staff victim and (2) assault and battery of a fellow prisoner. Both offenses are designated as "Class I," or major, misconduct offenses by the Michigan Department of Corrections. Nash was accordingly entitled to a hearing with certain procedural protections, including the ability to request and review evidence. *See* Mich. Comp. Laws § 791.252. At the conclusion of the hearing, the hearing officer found Nash guilty of both charges against him.

Only the first charge against Nash—for assault and battery of a staff victim—is relevant here. The applicable Michigan Department of Corrections policy notes that "assault and battery" of a staff victim includes "physical resistance or physical interference with an employee." Class I Misconduct Hr'g Rep., R. 36-4, PageID 393, 418. The charge related to Nash's having generally resisted the officers' attempts to control him.

Nash pleaded not guilty, which led to a hearing regarding the charge. For that proceeding, the hearing officer reviewed several pieces of evidence, including the three prison videos and a report from a hearing investigator assigned to look into the matter. The hearing officer's report states that although Nash was entitled to request that the hearing investigator

gather evidence, Nash "did not request witnesses, submit questions, or request evidence," and so did not "reasonably cooperate" with the hearing investigator. *Id.* at PageID 393.[1] Nash was permitted to participate in the hearing, but his access to evidence was limited. The hearing officer's report states that although the record was "reviewed with" Nash, he was not permitted to view the prison videos either before or during the hearing. *Id.* at PageID 393, 395. Those videos, the hearing report states, were marked confidential for "facility safety and security" purposes. *Id.* at PageID 395.

The hearing officer found Nash guilty, relying substantially on the prison videos as support for the ruling. The hearing officer found that after Nash had attacked another inmate, he had resisted the officers' attempts to handcuff him by "pulling away and rolling around," thereby "prevent[ing] the officers from placing" him in handcuffs. *Id.* at PageID 396. The hearing officer then found that after Nash was handcuffed and was being led by Bryce and Turner through the prison, he had "continued to resist by pulling away, walking side to side, and then turning around towards the escorting officers." *Id.* The hearing officer thus concluded that Nash had "physically resisted the officers' attempts to restrain and escort him," so the hearing officer upheld the charge against Nash. *Id.*

Nash did not exercise his right to seek judicial review in Michigan state court of the hearing officer's determination. *See* Mich. Comp. Laws § 791.255.

## III.    **Procedural Background**

In January 2022, Nash filed suit against Bryce and Turner in their individual capacities under 42 U.S.C. § 1983, arguing that their use of force against him was constitutionally

---

[1]The record is unclear as to whether Nash in fact declined to request access to evidence. In the same packet containing the hearing officer's misconduct report, there is an undated letter from Nash to the hearing investigator in which Nash states that he "received [the] misconduct report" and "would like ALL evidence." Class I Misconduct Hr'g Rep., R. 36-4, PageID 394. Because the letter is not dated, it is unclear whether Nash sent the letter before the major misconduct hearing.

excessive and accordingly violated his Eighth Amendment right to be free from cruel and unusual punishment.**2**

Bryce and Turner filed a motion for summary judgment, contending that Nash had not raised a genuine dispute of material fact as to whether they had violated his Eighth Amendment rights and that they were accordingly entitled to qualified immunity.

In January 2024, the magistrate judge issued a Report and Recommendation to grant the defendants' motion for summary judgment, concluding that Nash had not raised a genuine dispute of material fact as to whether the defendants' use of force violated his Eighth Amendment rights. The magistrate judge acknowledged that Nash, Turner, and Bryce had offered conflicting testimony regarding the events leading up to the takedown. But the magistrate judge reasoned that the Supreme Court's opinion in *Scott v. Harris* required the court to view the evidence as "depicted by the videotape"—and those prison videotapes "blatantly contradicted" Nash's recounting of events. R. & R., R. 39, PageID 441 (quoting *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). The magistrate judge elaborated: "In the Court's view, the video shows that Nash veered side to side through the hallway, bent over at the waist suddenly as he went through the door to the yard, and took fast shuffling steps as defendants followed him outside." *Id.* The magistrate judge reasoned that the video evidence thus "corroborate[d] defendants' testimony that they took Nash down because he was actively pulling away from them." *Id.* Because the videotapes purportedly corroborated the defendants' testimony, the magistrate judge chose to disregard Nash's version of events. Next, the magistrate judge explained that the hearing officer's factual findings from Nash's prison misconduct hearing— specifically, that Nash had actively resisted Bryce and Turner, prompting the takedown—should have preclusive effect on the litigation. From its review of the videotapes and the hearing officer's findings that Nash had resisted Bryce and Turner, the magistrate judge concluded that

---

**2**Nash initially filed this suit *pro se* in the United States District Court for the Western District of Michigan and named three other individuals, in addition to Bryce and Turner, as defendants. The Western District of Michigan screened Nash's complaint pursuant to the Prison Litigation Reform Act, *see* 28 U.S.C. §§ 1915(e)(2), 1915A, and dismissed two individual defendants and transferred the case to the Eastern District of Michigan. The Eastern District of Michigan then screened Nash's complaint again and dismissed a third defendant. Nash did not appeal the dismissal of any of the three other defendants. Nash, now represented by counsel, proceeds against Bryce and Turner only.

Nash had not raised a genuine dispute of material fact regarding whether Bryce and Turner violated his constitutional rights, so Bryce and Turner were entitled to qualified immunity.

The district court adopted the Report and Recommendation over Nash's objections and granted the defendants' motion for summary judgment. As relevant here, the district court reasoned that the magistrate judge had been right to rely on the videotapes to dismiss Nash's testimony because Nash's "account [wa]s contradicted by" the video. Order, R. 42, PageID 710–11.[3]

This timely appeal followed.

### ANALYSIS

We review de novo the district court's order granting the defendants' motion for summary judgment on qualified immunity grounds. *Helphenstine v. Lewis County*, 60 F.4th 305, 314 (6th Cir. 2023). At summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (citation and internal quotation marks omitted). If the evidence would allow a reasonable jury to find for the nonmoving party, a court may not grant summary judgment. *Id.*

We apply this standard in evaluating whether the district court erred in granting qualified immunity to Bryce and Turner. A public official is entitled to qualified immunity when, viewing the facts in the light most favorable to the plaintiff, the official's conduct did not violate "clearly established . . . constitutional rights of which a reasonable person would have known." *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (citation omitted). Here, to demonstrate that the district court erred, Nash must show a genuine dispute of material fact regarding whether Bryce and Turner violated his Eighth Amendment rights by subjecting him to an "unnecessary and wanton infliction of pain" when they took him to the ground. *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citation omitted).

---

[3]Because the district court adopted the magistrate judge's Report and Recommendation to grant the defendants' motion for summary judgment in a short order, the Report and Recommendation supplies much of the relevant reasoning. We accordingly refer to the magistrate judge's reasoning. *See Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 901–03 (6th Cir. 2007) (examining the magistrate judge's reasoning where the district court had "adopted without significant comment the magistrate's report and recommendation").

**I.      Relevant Facts for Summary Judgment**

Before we can arrive at the question of whether there is a genuine dispute of material fact regarding Nash's Eighth Amendment rights, we must "determine the relevant facts," *Scott*, 550 U.S. at 378—in particular, whether Nash was resisting Bryce and Turner when they chose to take him down.  This "first step" in our analysis requires us to review two of the district court's conclusions about the factual record.  *Id.*  *First*, the district court concluded that the hearing officer's factual findings from the Michigan major misconduct hearing should have preclusive effect on this litigation.  *Second*, the district court, citing *Scott v. Harris*, 550 U.S. 372 (2007), concluded that because the videos of the relevant events clearly contradicted Nash's testimony, it could decline to accept that testimony for the purposes of summary judgment.  We hold that both conclusions regarding the factual record were erroneous: the district court should not have afforded preclusive effect to the hearing officer's factual findings, and it should not have relied on the prison videos to disregard Nash's testimony.

**A.      Preclusion from Michigan Major Misconduct Hearing**

We turn first to Nash's argument that the district court erred in concluding that the hearing officer's factual findings from the prison misconduct hearing should have preclusive effect on this litigation.  As we have noted, the hearing officer found that Nash actively resisted Bryce and Turner, both as they tried to handcuff him after he attacked another prisoner and a couple of minutes later as they led him out to the prison yard.  The hearing officer's factual finding that Nash actively resisted the officers as they led him out to the prison yard bears directly on whether the takedown reflected an "unnecessary and wanton infliction of pain." *Williams*, 631 F.3d at 383.

We determine whether to give that factual finding preclusive effect by evaluating the four criteria set forth by the Supreme Court in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), for "according preclusive effect to a state administrative agency's unreviewed factual determination." *Peterson v. Johnson*, 714 F.3d 905, 912 (6th Cir. 2013).  *First*, the state agency must have been acting in a "judicial capacity." *Id.* (quoting *Elliott*, 478 U.S. at 799).  *Second*, the hearing officer must have "resolved a disputed issue of fact that was properly before" the

officer. *Roberson v. Torres*, 770 F.3d 398, 403 (6th Cir. 2014) (citation omitted). *Third*, the party to be precluded must have been afforded an "adequate opportunity to litigate" the "factual dispute." *Id.* (citation omitted). *Finally*, if the first three criteria are satisfied, the court "must give the agency's finding of fact the same preclusive effect it would be given in state courts." *Peterson*, 714 F.3d at 913. The test Michigan courts apply when deciding to give preclusive effect to an agency's findings of fact includes asking whether the parties had a "full and fair opportunity" to litigate those facts before the agency. *Id.* at 914.

Examining the *Elliot* factors, we have already held that factual findings from Michigan prison major misconduct hearings can, in some circumstances, have preclusive effect in a prisoner's federal litigation. *See id.* at 912–17; *Roberson*, 770 F.3d at 404–05. In *Peterson*, we confronted that issue and concluded that a prisoner's Michigan major misconduct hearing satisfied the *Elliott* factors and that the factual findings from the hearing could accordingly have preclusive effect over his federal litigation. 714 F.3d at 908. We reasoned that in Michigan major misconduct hearings, the hearing officer acts in a "judicial capacity" because the officer considers evidence from both parties and issues a written final decision that is subject to appeal. *Id.* at 912. And we concluded that the dispute of fact resolved by the hearing officer had preclusive effect over the prisoner's litigation because it was a "necessary predicate" to the hearing officer's ultimate ruling. *Id.* at 913. We then held that the prisoner had an adequate opportunity to litigate the disputed fact, pointing to the "statutory protections" available to the prisoner during the misconduct hearing, which included the opportunity to present evidence and arguments and the requirement that the hearing officer be impartial and recuse if the accused files a motion that establishes bias. *Id.* at 912–13.

Turning to the final *Elliott* prong, we explained that the test that Michigan courts apply "when deciding whether to give preclusive effect to an agency's factual determination" includes asking both whether "a question of fact essential to the judgment was actually litigated and determined by a valid and final judgment" and whether "the parties had a full and fair opportunity to litigate the issue." *Id.* at 914. As to the first question, we concluded that the finding had been "essential to the hearing officer's judgment," which had turned on the "precise[]" fact to have preclusive effect in the litigation. *Id.* As to the second question, the

prisoner had received a "full and fair opportunity to litigate" the factual dispute. *Id.* (citation omitted). We noted that in assessing whether an individual received such a full and fair opportunity, Michigan courts apply a multi-factor test "while recognizing that, ultimately, the answer 'rest[s] on the . . . court['s] sense of justice and equity.'" *Id.* at 914–15 (quoting *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845 n.2 (Mich. 2004)). Among those factors is whether a litigant had sufficient incentive to contest the issue in the prior proceeding, and we explained that there was "no question that [the prisoner] had incentive to vigorously contest" the dispute of fact. *Id.* at 915. We acknowledged, however, that it "g[ave] us pause" that the prisoner had not been represented by counsel during the major misconduct hearing because "Michigan courts have often found . . . the presence of counsel" to be "supporting evidence that a party has had a full and fair chance to litigate an issue." *Id.* at 916. But we decided that the prisoner's lack of counsel was not "categorically dispositive" of the inquiry under Michigan law. *Id.* We elaborated that it appeared that the "absence of counsel" was not "problematic" for that prisoner's case, given that the "sole factual issue was a very simple one," and an attorney accordingly would "likely have had only negligible influence" on the critical dispute of fact. *Id.* at 917. In light of the facts and circumstances presented in *Peterson*, we concluded that Michigan state courts would grant preclusive effect to the hearing officer's factual findings. *Id.*

A subsequent case, *Roberson v. Torres*, clarified that *Peterson* should not be read as a "blanket blessing" to afford preclusion to "every factual finding in a major-misconduct hearing" because the court's decision in *Peterson* to afford preclusive effect to particular findings from the prisoner's misconduct hearing "necessarily turned, at least in part, on the particular circumstances of" the prisoner's case. *Roberson*, 770 F.3d at 404. We emphasized that because application of the *Elliott* factors is fact-dependent, "the question of preclusion cannot be resolved categorically." *Id.* at 404–05. Rather, the preclusion determination "turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice." *Id.* at 405; *see also Peterson*, 714 F.3d at 914–17. We also reiterated, as we had stated in *Peterson*, that the preclusion issue likewise "turns on the court's 'sense of justice and equity,' which may require a case-by-case analysis of surrounding

circumstances." *Roberson*, 770 F.3d at 405 (quoting *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971)).

On appeal, Nash contends that the hearing officer's findings of fact should not be given preclusive effect because the circumstances of the hearing demonstrate that he lacked a full and fair opportunity to litigate the factual dispute. He emphasizes that he was "not provided an opportunity to review any of the evidence relied on" by the hearing officer, even though he requested access to evidence prior to the hearing. Appellant Br. at 44. Reviewing the "particular circumstances" of Nash's major misconduct hearing, we agree that the district court erred in affording preclusive effect to the hearing officer's factual findings because Nash did not have a full and fair opportunity to litigate the factual question of whether he resisted Bryce and Turner as they walked with him out to the prison yard.[4] *Roberson*, 770 F.3d at 404.

To begin, as Nash emphasizes, Nash lacked access to crucial evidence during the misconduct hearing process. In the misconduct hearing report, the hearing officer stated that, before the hearing, Nash had been afforded an opportunity to request evidence, but he had declined to do so. But the record is unclear as to whether Nash in fact declined to request access to evidence before the hearing. In the same packet containing the hearing officer's report, there is a letter from Nash to the hearing investigator in which Nash wrote that he had "received [the] misconduct report" and "would like ALL evidence." Class I Misconduct Hr'g Rep., R. 36-4, PageID 394. Pointing to that letter, Nash contends that the hearing officer's statement that he

---

[4]On appeal, Nash argues that the major misconduct hearing did not afford him a full and fair opportunity to litigate the question of whether he was resisting Bryce and Turner before they took him down in the prison yard. He emphasizes that, in both *Peterson* and *Roberson*, we explained that in deciding whether to afford factual findings from a hearing preclusive effect, Michigan state courts pay careful attention to whether the litigant to be precluded had a full and fair opportunity to litigate in the hearing. Relying on Michigan's test for whether to afford preclusion, which includes asking "whether the party to be precluded had sufficient incentives to litigate" and whether affording preclusion would comport with "the court's sense of justice and equity," he contends that preclusion would be inappropriate here. Appellant Br. at 42. And he argues, specifically, that we should not afford preclusion to the misconduct hearing here because he was denied adequate access to evidence during the hearing. Thus, Nash has done more than invoke a "threshold legal language." Dissenting Op. at 43. And, as we will explain, this argument is, alone, sufficient for us to decide that the misconduct hearing should not be given preclusive effect. We would therefore reverse the district court's preclusion decision based on an issue that Nash raised throughout this litigation. *Cf.* Dissenting Op. at 38. To the extent that we examine additional reasons that preclusion is inappropriate beyond those that Nash directly addressed in his brief on appeal, those issues are fairly encompassed within Nash's arguments that, based on Michigan's test as described in *Peterson* and *Roberson*, he was deprived of a full and fair opportunity to litigate.

declined to request evidence is inaccurate.  Unfortunately, because that letter is not dated, it is not possible to tell with any certainty whether Nash sent the letter before or after the misconduct hearing.[5]  Construing the letter in Nash's favor, as we must at summary judgment, the letter creates at least a dispute of material fact as to whether Nash in fact requested access to evidence before the hearing and whether the hearing officer did not receive (or, less charitably, simply ignored) that request.  That itself is reason to conclude that Nash lacked a full and fair opportunity to litigate the dispute: certainly, an individual who permissibly requests, but is denied, access to highly relevant evidence is not given a fair opportunity in that litigation.

Even setting aside the question of whether Nash indeed requested access to evidence prior to the hearing, Nash's access to evidence relied upon *during* the hearing was insufficient to have afforded him a "full and fair opportunity" to litigate the relevant factual dispute.  *Peterson*, 714 F.3d at 914.  In finding that Nash was guilty of assault and battery of a staff victim, the hearing officer relied heavily on his own view of the prison videotapes.  Nash was not permitted to view those videotapes—arguably the most crucial pieces of evidence underlying the dispute— at any point during the misconduct hearing process.  That is because the hearing officer "exercised his statutory authority to keep" the video evidence "confidential" and prevent Nash from viewing it.  *Peterson*, 714 F.3d at 909; *see also* Mich. Comp. Laws § 791.252(h) (noting that a hearing officer "may deny access to the evidence to a party" if the officer "determines that access may be dangerous to a witness or disruptive of normal prison operations").  As statutorily required, the hearing officer explained in his report that he had marked the video confidential "for facility safety and security and to avoid disclosure of camera locations and capabilities." Class I Misconduct Hr'g Rep., R. 36-4, PageID 395; *see also* Mich. Comp. Laws § 791.252(h) (noting that if a hearing officer chooses to "deny access to the evidence to a party," the "reason for the denial shall be entered into the record").

---

[5]At first blush, Nash's statement in the letter that he had "received [a] misconduct report" could be read to suggest that Nash did not send this letter until receiving the hearing officer's *final* report.  But a closer examination of the record shows that Nash's reference to the "misconduct report" could mean one of multiple documents.  The hearing officer's final report was titled the "Class I Misconduct Hearing Report."  Class I Misconduct Hr'g Rep., R. 36-4, PageID 393.  But, somewhat confusingly, the citation that Bryce issued Nash—which Nash presumably received prior to the hearing process—was titled the "Misconduct Report."  *Id.* at PageID 397.  Thus, Nash's reference to the "misconduct report" could just as easily refer to the citation document he had received from Bryce—which perhaps suggests that he did, indeed, request evidence prior to the hearing.

The limitations on Nash's access to evidence during the hearing did not end with the videotapes. The hearing officer's report indicates that, including the videotapes, the hearing officer relied on twelve pieces of evidence as support for his ruling. The hearing officer designated seven of those total twelve pieces of evidence as "confidential," meaning that Nash did not get to view them. Class I Misconduct Hr'g Rep., R. 36-4, PageID 395. Included among those seven pieces of evidence was virtually all information regarding the videotapes—not just the videotapes themselves, but also stills from the videos and a memorandum from the hearing investigator to the hearing officer in which the hearing investigator provided a time-stamped log of what each video showed. *Cf.* Recording of Oral Arg. at 17:57-18:02 (counsel for defendants acknowledging that Nash was denied access to all information regarding what the video showed, including the time-stamped log describing the video). So Nash was denied all information regarding the contents of the videotapes, even though they appear to have been crucial to the hearing officer's determinations. It is difficult to imagine how an individual who is denied access to any part of the most crucial evidence has received an adequate opportunity to litigate a dispute.

To be sure, in *Peterson*, we held that the findings from the prisoner's major misconduct hearing could have preclusive effect on his federal litigation—even though the prisoner was not permitted to view the video of the relevant events. 714 F.3d at 909. But we cannot read *Peterson* in a vacuum, divorced from our consistent later case law. In *Roberson*, this court made clear that *Peterson* turned on its facts and that the case should not serve as a "blanket blessing" to afford preclusion to every Michigan major misconduct hearing. 770 F.3d at 404–05. *Roberson* instead emphasized that courts must closely examine the "particular circumstances" of a prisoner's case and consider whether the prisoner in fact had a "full and fair opportunity" to litigate. *Id.* at 405. An examination of those particular circumstances—as instructed by *Roberson*—reveals that Nash did not have such a full and fair opportunity here. Nash's case, in other words, is not on all fours with *Peterson*.

Indeed, the limitations on Nash's access to the evidence here were substantially greater than the limitations on the prisoner's access in *Peterson*. There, we noted that the "*only* evidence" that the hearing officer had denied the prisoner from viewing "was the video of the

event." *Id.* (emphasis added).  The hearing officer had also gone to some lengths to ensure that, despite being prohibited from viewing the video itself, the prisoner received as much information as possible about what the video showed.  To that end, the hearing officer provided the prisoner "a detailed description of what the video depicted, down to the time-stamped second of each relevant recorded activity." *Id.*; *see also* Major Misconduct Rep., *Peterson v. Johnson*, No. 1:09-cv-00225 (W.D. Mich. Nov. 13, 2009), R. 25-3, PageID 198 (hearing officer explaining that although he had prohibited the prisoner from viewing the video, for "purposes of confrontation" he "did generally reveal the content of the video to the charged prisoner at [the] hearing" by providing a time-stamped description of what the video showed).

Here, by contrast, the hearing officer denied Nash access not only to the video, but also to both the memorandum that provided time-stamped details regarding what was shown in the video and still images from the videotape (along with other relevant pieces of evidence).  This distinction between Nash's case and *Peterson* is significant.  *Cf.* Dissenting Op. at 36 (contending that Nash's case mirrors *Peterson* in every "legally significant way").  It means that, quite unlike Nash, the prisoner in *Peterson* was provided with at least some minimal amount of evidence required to make arguments using the video.  This fact does not lack "legal significance." Dissenting Op. at 40.  Rather, *Roberson* relied on it in explaining why preclusion was appropriate in *Peterson* despite the inmate's inability to view the video.  We emphasized that although *Peterson* concluded that preclusion was appropriate despite the fact that Peterson was not allowed to view the video, it did so "where . . . 'the hearing officer gave Peterson a detailed description of what the video depicted, down to the time-stamped second of each relevant recorded activity.'" *Roberson*, 770 F.3d at 404 (quoting *Peterson*, 714 F.3d at 915–16).  Nash did not get such evidence.

Thus, the record construed in Nash's favor demonstrates that Nash requested, but was denied, access to some of the most relevant evidence prior to the major misconduct hearing.  And it seems beyond question that Nash's lack of access to this evidence was highly prejudicial.  *Cf.* Appellant Br. at 44 ("Of course, without reviewing the evidence relied on by the ALJ, it significantly hampered Plaintiff's ability to defend himself against the charges.").  Under these circumstances, we do not believe that Michigan courts would conclude that Nash received a "full

and fair opportunity to litigate" the factual dispute. *Peterson*, 714 F.3d at 914 (citation omitted). Nor would it comport with our "sense of justice and equity" to afford preclusive effect to Nash's misconduct hearing under these circumstances—a factor that binding precedent and Michigan law dictate we consider. *Roberson*, 770 F.3d at 405 (quoting *Blonder-Tongue Labs.*, 402 U.S. at 334); *Peterson*, 714 F.3d at 915 (quoting *Monat*, 677 N.W.2d at 845 n.2). The fact that Nash was denied all access to evidence regarding the contents of the videos and related evidence is, alone, adequate reason to decline to afford preclusive effect to the hearing here.

There are yet more reasons to think that affording preclusive effect to the misconduct hearing would be inappropriate here. For example, Nash's lack of counsel during the hearing process also points against any notion that he received a full and fair opportunity to litigate the factual dispute.[6] As noted, in *Peterson* we stated that Michigan courts often look to the "presence of counsel" as relevant to whether a party had a "full and fair chance to litigate an issue." 714 F.3d at 916. We nonetheless concluded that the "absence of counsel" was not "categorically dispositive" of the question of whether a party had a full and fair opportunity to litigate. *Id.* at 916–17. We then turned to the particular facts and circumstances of the prisoner's misconduct hearing and concluded that, on those facts, the absence of counsel for the prisoner was not "problematic" because the "sole factual issue" at dispute during the hearing "was a very simple one," and an attorney would accordingly have had "only negligible influence on such a factual judgment." *Id.* at 917.

The same cannot be said here. Given what we know about Nash's prison hearing, it seems that an attorney representing Nash would have had more than a "negligible influence" on the hearing officer's factual finding that Nash actively resisted the officers as they led him out to the prison yard. *Id.* For starters, an attorney representing Nash would likely have been able to

---

[6]The dissent characterizes Nash's lack of counsel during the misconduct hearing process as "Nash's own doing." Dissenting Op. at 44. But counsel is expensive, and Nash is an indigent defendant. Nash began this litigation *pro se*, received permission to proceed *in forma pauperis*, and unsuccessfully moved for the appointment of counsel before the district court (before eventually managing to retain counsel over a year into the litigation). We would not fault Nash for failing to retain counsel for the prison misconduct hearing. In any event, by examining the non-dispositive factor of whether Nash was represented by counsel—and by responding to the dissent's contention that indigent defendants are at fault for not retaining counsel for administrative hearings—we do not "deem[] Michigan's disciplinary scheme a legal nullity." Dissenting Op. at 47. Instead, we follow our binding precedent and Michigan law, both of which require us to consider presence of counsel as one of the multiple factors in our analysis. *Peterson*, 714 F.3d at 916.

view—and make arguments using—the substantial swaths of evidence to which Nash was denied access. Because, as we will explain, the video evidence is far less clear than the hearing officer (and later the district court) made it out to be, an attorney's assistance in presenting arguments as to why the video evidence was inconclusive would have substantially impacted—or, as the outcome of this appeal suggests, perhaps even changed the outcome of—the hearing. In addition to viewing and making arguments using the existing evidence, an attorney could also have requested more evidence, including—as Nash emphasizes on appeal—a statement from Turner, whose deposition testimony contradicted Bryce's allegations against Nash. We believe that, under these circumstances, Nash's lack of representation during the hearing process further points against the notion that he had full and fair opportunity to litigate the factual dispute.[7]

What's more, a review of the misconduct hearing report suggests that Nash lacked "sufficient incentives to litigate" the hearing officer's factual finding that Nash resisted Bryce and Turner as they walked with him out to the prison yard. *Roberson*, 770 F.3d at 405; *see also Peterson*, 714 F.3d at 911, 915 (noting that Michigan courts look to whether an individual had sufficient incentives to litigate in assessing whether they had a full and fair opportunity to litigate). That specific finding was not necessary for the hearing officer to rule that Nash was guilty of assault and battery of a staff member.

To understand why, recall that the applicable Michigan Department of Corrections policy states that "assault and battery" of a staff member includes any "physical resistance or physical interference with an employee." Class I Misconduct Hr'g Rep., R. 36-4, PageID 418. So, to find Nash guilty of assault of a staff member, the hearing officer needed to determine only that Nash had physically resisted Bryce and Turner at any point between when he attacked another prisoner and when he was ultimately taken to the ground by the officers. Nash was already guilty of that

---

[7]We are, of course, bound by *Peterson*'s statement that a prisoner's lack of counsel during a major misconduct hearing process is not categorically dispositive of the preclusion question. We note, however, that there are serious questions regarding whether a prisoner who is not represented by counsel during a prison misconduct hearing process ever truly has an adequate opportunity to contest the charges against him. Indeed, we are aware of no other federal court of appeals that has held that a party who was unrepresented by counsel during a state administrative process had an adequate opportunity to litigate the factual dispute. And the Supreme Court has not had cause to address the issue because the party precluded in *Elliott* was represented by counsel during the administrative process. *See Elliott v. Univ. of Tenn.*, 766 F.2d 982, 985 (6th Cir. 1985). Given *Peterson*, the question of whether a prisoner's lack of counsel, standing alone, is dispositive of the preclusion issue would need to be addressed by an en banc court.

offense by virtue of having resisted Bryce, Turner, and other officers when they tried to handcuff him after he attacked another prisoner, as the prison video clearly shows.  Thus, the factual question at issue here—whether Nash *also* resisted Bryce and Turner as they walked him into the prison yard—was not necessary to the hearing officer's ultimate determination.

Indeed, the hearing officer's final report makes plain that the hearing officer did, in fact, find Nash guilty of assaulting Bryce and Turner on the basis of more conduct than Nash's having pulled away from the officers as they led him out to the prison yard.  In the section of his report concerning assault and battery of a staff victim, the hearing officer first summarized the applicable definition of that charge; he noted that assault and battery includes "physical resistance or physical interference with an employee."  *Id.* at PageID 396.  He then made findings in support of his conclusion that Nash had assaulted Bryce and Turner at multiple instances during the relevant events, including addressing Nash's resistance to being handcuffed just after he assaulted another prisoner.  The hearing officer concluded:

> Officer Bryce reported that Prisoner Nash actively resisted and lunged away from the escorting officers.  Video surveillance showed Prisoner Nash resisted staff's attempts to restrain him by continuing to move towards [the prisoner he had attacked], rolling around, and pulling away from staff, additional staff assisted, the prisoner was restrained, placed on his feet, and as he was being escorted from the unit, he continued to pull away from the officers, moved side to side as he walked, and as they exited the unit, Prisoner Nash pulls away and turns around towards the escorting officers, he was taken [to] the ground, additional staff assisted, and the prisoner was escorted away from the unit.  The ALJ finds the prisoner resisted the officer's attempts to restrain him by pulling away and rolling around prevent[ing] the officers from placing restraints.  The ALJ also finds after the restraints were placed, the prisoner continued to resist by pulling away, walking side to side, and then turning around towards the escorting officers, and these actions interfered with the officers' attempts to restrain and escort him from the unit. . . . Therefore, the ALJ finds the prisoner physically resisted the officers' attempts to restrain and escort him.  The charge is upheld.

*Id.*

As this reasoning makes clear, the hearing officer made specific findings that Nash assaulted the officers *both* by "resist[ing] the officers' attempts to restrain him by pulling away and rolling around" after he assaulted another prisoner *and* by "pulling away" from the officers as they led him out into the prison yard.  *Id.*  The upshot is that, even if Nash had successfully

argued that he did not pull away from the guards while they walked him out of the prison hallway and into the prison yard, the hearing officer still would have found that Nash committed an assault earlier by resisting the guards' attempts to restrain him. As a result, we believe that Nash lacked "sufficient incentives to litigate" the particular factual issue of what happened when Nash exited the prison yard with Bryce and Turner. *Roberson*, 770 F.3d at 405; *see also Peterson*, 714 F.3d at 914–15.

It follows that, for this additional reason, Michigan courts would not afford the relevant factual finding preclusive effect. As we have explained, in evaluating the preclusive effect of an agency's factual determinations, Michigan courts look both to whether the parties "had a full and fair opportunity to litigate the issue" and to whether "a question of fact *essential to the judgment* was actually litigated and determined by a valid and final judgment." *Peterson*, 714 F.3d at 914 (emphasis added). That Nash lacked incentive to litigate the relevant dispute means that he lacked a "full and fair opportunity" to litigate the factual question of whether he resisted Bryce and Turner before they took him down. *Id.* at 914–15. The factual issue to have preclusive effect in this litigation—whether Nash resisted Bryce and Turner as they walked him into the prison yard—was also not "essential to the hearing officer's judgment." *Id.* at 914. To the contrary, the hearing officer's judgment (and Nash's resulting punishment) would seemingly have been unchanged even absent this fact.[8]

To be sure, read in isolation, the citation document here—that is, the misconduct ticket that Bryce prepared shortly after taking Nash to the ground, which charged Nash with assault of a staff member—references only Nash's resistance to Bryce and Turner as they walked with Nash out from the hallway and into the prison yard, not Nash's earlier resistance to the officers just after he assaulted a fellow inmate. Dissenting Op. at 48. But the misconduct hearing officer's report shows that the scope of the hearing was focused more broadly on whether Nash assaulted the officers during their entire interaction with him. In addressing the charge regarding the assault and battery of a staff member, the hearing officer appears to have understood that the charge was not tied to the precise moment when Bryce and Turner took Nash to the ground. The

---

[8]At oral argument, counsel for Bryce and Turner was asked whether Nash's punishment would have changed depending on whether he was found guilty of more than one charge of assaulting a staff member. Counsel acknowledged that nothing in the record indicated that Nash's punishment would have changed.

hearing officer stated: "Officer Bryce reported that Prisoner Nash actively resisted and lunged away from the escorting officers.  Video surveillance showed that Prisoner Nash resisted staff's attempts to restrain him by continuing to move towards [the other prisoner] . . . ."  Class I Misconduct Hr'g Rep., R. 36-4, PageID 396.  And, as just explained, in finding Nash guilty of assaulting a staff member, the hearing officer made explicit findings regarding Nash's actions not only immediately before the takedown, but also earlier, just after he assaulted a prisoner. *See id.* (finding that Nash "resisted the officer's attempts to restrain him by pulling away and rolling around prevent[ing] the officers from placing restraints" and that "after the restraints were placed, [Nash] *continued to resist* by pulling away, walking side to side, and then turning around towards the escorting officers, and these actions interfered with the officers' attempts to restrain and escort him from the unit" (emphasis added)).  The hearing officer's choice to make a finding concerning Nash's assault of Bryce and Turner as they struggled to place restraints on him after he had assaulted another prisoner is telling.  So too is the hearing officer's choice to phrase the finding concerning Nash's later struggle against the officers as he walked out of the prison hallway into the yard as a *continuation* of his earlier resistance.  If the only conduct relevant to Nash's assault charge was Nash's resistance in the few seconds before Bryce and Turner took him to the ground, much of the hearing officer's reasoning makes little sense.

In any event, the relevant question is not whether we can decipher the precise scope of the conduct for which Nash was cited—it is whether, considering the circumstances of the hearing, we think Nash had "sufficient incentives to litigate" the hearing officer's factual finding that Nash resisted Bryce and Turner as they walked with him out to the prison yard.  *Roberson*, 770 F.3d at 405; *Peterson*, 714 F.3d at 911, 915.  The hearing officer's findings indicate that Nash's conduct just after he assaulted another prisoner was, indeed, also at issue during the hearing.  We accordingly believe that Nash lacked sufficient incentives to litigate whether he later resisted the officers and that a Michigan court would not afford preclusive effect to that particular finding by the hearing officer.

Because Nash lacked adequate access to the evidence, was unrepresented during the hearing, and did not have sufficient incentives to litigate the relevant factual dispute, we hold

that the district court erred in affording the hearing officer's findings preclusive effect in this litigation.

**B.      Comparing the Video Evidence and the Parties' Testimony**

Having concluded that the factual findings from the Michigan major misconduct hearing do not have preclusive effect on this litigation, we turn to Nash's argument that the district court erred in disregarding his testimony on the grounds that it was "blatantly contradicted" by the video tapes. *Scott*, 550 U.S. at 380. Because the videos in this case were far from clear, we agree with Nash and hold that the district court erred in disregarding his testimony.

At summary judgment, construing the facts in the light most favorable to the nonmoving party "usually means adopting the plaintiff's version of the facts." *Coble v. City of Whitehouse*, 634 F.3d 865, 868 (6th Cir. 2011). The Supreme Court has clarified, however, that a court must view the facts in the light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380 (quoting Fed. R. Civ. P. 56(c)). A videotape that "blatantly contradict[s]" the nonmoving party's telling can render a factual dispute not genuine. *Id.* Accordingly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Nash's testimony was that he did not resist Bryce and Turner as they walked him out into the prison yard. Specifically, Nash testified that as he walked through the hallway with Bryce and Turner, he was bent forward because the officers had his arms held up behind his back in an uncomfortable position, so that his face was forced downward towards the floor. Nash stated that he was not struggling against Bryce and Turner before they decided to slam him to the ground, but rather tried only to move his arms slightly downward to a less uncomfortable position.

Contrary to the district court's conclusion, the videos here do not come close to "blatantly contradict[ing]" this testimony. *Id.* The videos show that as Nash walks through the hallway with Bryce and Turner, he sways slightly back and forth; in fact, Nash concedes as much. But

the fact that Nash was swaying slightly as he walked in the hallway does not contradict his testimony, nor does it show that he was struggling against the officers. In fact, Turner testified that he had no issues with Nash swaying from side to side. As Nash proceeds down the hallway with Bryce and Turner toward the door to the prison yard, it does appear—as the magistrate judge stated—that Nash was bent over at the waist. But that fact is not inconsistent with Nash's testimony either: Nash testified that the officers had forced him into this bent position because of the way they were holding his arms behind and above him. From the videotape, we cannot tell *why* Nash was bent over. We must "view any relevant gaps or uncertainties left by the videos in the light most favorable to" Nash. *LaPlante*, 30 F.4th at 578 (citation omitted). So we must assume in Nash's favor that Bryce and Turner forced him into this position.

Likewise, we cannot see what happens at the very end of the hallway as Nash, Bryce, and Turner walk out of the door to the prison yard in the moments before the takedown. Bryce's and Turner's backs are to the camera, with their bodies largely blocking Nash from view. As Nash, Turner, and Bryce exit the hallway together, all that we can see of Nash is part of his white shirt and, for a brief moment, one of his arms. The video does not, in other words, show Nash "buck[] back and forth" and then "ben[d] over at the waist suddenly," as the magistrate judge stated. R. & R., R. 39, PageID 440–41. To the contrary, we can barely see Nash at all.[9]

What happens just as Nash, Bryce, and Turner exit the hallway and enter the prison yard is impossible to tell because the three men are entirely obscured by the open hallway door. Once we can see Nash in the video, it does appear—as the magistrate judge stated—that his footsteps shuffle slightly. But it is unclear whether Nash is shuffling because he is attempting to pull away from the officers, or rather because the defendants had already begun to move Nash's body as they executed the takedown maneuver.

---

[9]One part of the video would seem to cut against the notion that Nash was struggling against Bryce and Turner while walking through and out of the hallway. The video shows that as Nash, Turner, and Bryce enter the hallway, a third officer follows them in. After watching them walk down the hallway for a moment, the officer calmly turns back to close the door behind him. At an unhurried pace, the officer follows Nash, Bryce, and Turner out as they open the door and exit the hallway to the outside. It appears that the officer might have sped up as he reached the end of the hallway, but based on the timestamps shown on the videos, it seems that the officer did not speed up until Bryce and Turner had already begun actively taking Nash to the ground. Had Nash been visibly struggling against Bryce and Turner prior to the takedown, we might expect to see the third officer respond differently. We can accordingly assume in Nash's favor that the third officer did not see any cause for alarm.

Based on the videotapes, it is possible that a reasonable jury could review the videos and decide, like the magistrate judge and the district court, that it believes the defendants' contentions that Nash had been struggling against them, triggering the takedown. But a reasonable jury could also view the videotapes, listen to various testimony, and instead conclude that Nash had not been struggling when Bryce and Turner decided to take him down. When videotape evidence is subject to such reasonable debate, it is error for a court to grant summary judgment based on its own interpretation of what the video shows. *See Coble*, 634 F.3d at 869–70.

The magistrate judge's focus on whether the videos "corroborate[d]" the defendants' version of events accordingly reflects the wrong inquiry. R. & R., R. 39, PageID 441. In assessing whether a video makes it necessary to disregard the nonmovant's testimony, a court should not ask whether the video makes the movant's story *more likely*. Instead, a court must ask whether the video evidence illustrates that the nonmovant's version of events is so "blatantly contradicted by the record" that "no reasonable jury could believe it," thus making summary judgment appropriate. *Scott*, 550 U.S. at 380. As we have explained, "[f]acts that are not blatantly contradicted by the . . . recording remain entitled to an interpretation most favorable to the non-moving party." *Coble*, 634 F.3d at 870. So, instead of dismissing Nash's testimony out of hand, the magistrate judge should have carefully examined the video evidence, identified the facts, if any, from Nash's testimony that the magistrate judge thought the video evidence blatantly contradicted, and then assumed the remaining facts in Nash's favor.

Instead of conducting that inquiry, the magistrate judge appears to have overlooked other record evidence that undercut any notion that the video evidence resolved this case. Crucially, after Turner watched the videotapes in his deposition, he testified: "The camera doesn't give a good representation of the situation." Turner Dep., R. 36-3, PageID 377. Further, the magistrate judge's statement that the videotape "corroborates" the defendants' testimony seems to have disregarded the fact that the defendants' testimony was itself inconsistent. R. & R., R. 39, PageID 441. For example, Turner explained that the takedown was prompted by Nash's throwing his head back, almost hitting Bryce in the face. Bryce, by contrast, made no mention of Nash moving his head back, and instead testified that he executed the takedown maneuver because Nash had actively turned towards him in an attempt to face him. (Turner also explicitly

contradicted the notion that Nash had voluntarily turned towards Bryce, testifying that Nash was turned around in the course of the takedown, not of his own volition.) It is accordingly difficult to ascertain which version of events the magistrate judge believed the videos corroborated.

We thus hold that the district court erred in dismissing Nash's testimony as being contradicted by the video evidence. Having so concluded, we must still "determine the relevant facts" for the purposes of analyzing Nash's Eighth Amendment claim. *Scott*, 550 U.S. at 378. With the appropriate standard in view—that is, construing the facts in the light most favorable to Nash and relying on the videos only to the extent that they blatantly contradict Nash's story—a different set of facts emerges:

Nash smashed his food tray into another prisoner and then struggled against the corrections officers as they tried to handcuff him. As Bryce and Turner began escorting Nash out of the dayroom, with Nash's hands now handcuffed behind his back, Nash was calling them names and swearing at them. Turner and Bryce then walked Nash through the hallway and outside. While in the hallway, Nash swayed back and forth slightly, but we cannot assume that Nash's swaying indicates that he was struggling against the officers. Nash then walked with his torso bent over, but we assume that Nash was bent over because the officers were forcing him into this position by holding his arms up behind his back. We cannot see what happened as Bryce, Turner, and Nash walked through the hallway door to the prison yard, so we assume that Nash tried only to adjust his arms back to a more neutral position. Bryce and Turner responded to this minor movement by slamming Nash to the cement. Although the video shows that Nash turned to his left and shuffled his feet as he, Bryce, and Turner exited the breezeway, we assume that these movements were caused by the takedown and were not evidence of a struggle.

In short, construing the record in Nash's favor, the record reflects that Bryce and Turner chose to take Nash to the ground in response to his minor adjustment of his arms to a more neutral position.

## II.    Qualified Immunity on Nash's Eighth Amendment Claim

With the "relevant facts" in view, we turn to the question of whether the district court erred in granting Bryce and Turner summary judgment on their qualified immunity defense.

*Scott*, 550 U.S. at 378. To overcome the defendants' qualified immunity defense, Nash "must show that (1) the official[s] violated his constitutional rights, and (2) at the time of the violation, it was 'clearly established' that the officer[s'] conduct would violate the constitution." *Heeter*, 99 F.4th at 908 (quoting *Palma v. Johns*, 27 F.4th 419, 428 (6th Cir. 2022)). Examining both of these issues, we hold that Bryce and Turner are not entitled to summary judgment on their qualified immunity defense.

## A.      Constitutional Violation

"The Eighth Amendment prohibits the imposition of 'cruel and unusual punishments' upon prisoners." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). Although the "maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law," *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002), prison officials nevertheless violate the Eighth Amendment when their conduct "reflects an unnecessary and wanton infliction of pain," *Williams*, 631 F.3d at 383 (citation omitted). To show that Bryce's and Turner's use of force violated his Eighth Amendment rights, Nash must "satisfy both an objective and a subjective component." *Id.* The subjective component "focuses on the state of mind of the prison officials." *Id.* The determinative question for this component is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The objective component asks whether the pain inflicted by the officers was "sufficiently serious." *Williams*, 631 F.3d at 383 (citation omitted).

### 1.      Subjective Component

To determine whether a prison official had a sufficiently culpable state of mind, we attempt to draw "inferences" to ascertain whether the officer's use of force "could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a known willingness that it occur." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). We look to factors such as "the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Id.* (alteration in original and citation omitted). We also examine "the extent of the threat" posed by the prisoner "to the safety of staff and inmates," as the officers would

reasonably have perceived it at the time, and "any efforts made to temper the severity of a forceful response." *Id.*

To begin, Nash has raised a genuine dispute of material fact as to whether Bryce and Turner had "a plausible justification for applying *any* force" whatsoever to him. *Cordell*, 759 F.3d at 581 (emphasis added). As we have noted, construing the record in the light most favorable to Nash, as Nash, Bryce, and Turner exited the hallway, Nash moved his arms slightly downward to a more neutral position, closer to his body; he did not physically struggle or make other sudden movements that could have been reasonably interpreted as an attempt to fight or escape the officers. Bryce and Turner responded to Nash's minor arm movement by slamming him to the concrete, fracturing his ankle in two places. From this record, a reasonable jury could conclude that Bryce and Turner had a sufficiently culpable state of mind—officers, of course, may not tackle a prisoner to the ground, fracturing his ankle in two places, for no reason. *See, e.g.*, *Peterson*, 714 F.3d at 911 (noting that if a prisoner could show that an officer had no reason to pull him from his cell and attack him, the prisoner would have raised a genuine dispute as to the subjective intent prong); *Cordell*, 759 F.3d at 585–86 (explaining that we "have held in the past that 'striking a neutralized subject who is secured by handcuffs is objectively unreasonable'" (quoting *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010))).

Still, we recognize that an "official's decision to use force is entitled to deference," *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010), considering the reality that prison officials "must make their decisions in haste, under pressure, and frequently without the luxury of a second chance," *Hudson*, 504 U.S. at 6 (citation and internal quotation marks omitted). But this deference does little for Bryce and Turner. Even assuming that Nash's minor arm movements gave Bryce and Turner "a reasonable basis for using *some* force" against Nash, a reasonable jury could nonetheless conclude that the officers lacked "a reasonable basis for using the amount of force that [they] did." *Cordell*, 759 F.3d at 582. To the extent that Nash's minor movement reasonably caused Bryce and Turner some alarm, the "need for the application of force" was nonetheless quite minimal because Nash was handcuffed and was not actively struggling against the officers. *Whitley*, 475 U.S. at 321. Yet Bryce and Turner chose to respond

to Nash's movement with quite a considerable "amount of force"—they slammed him to the concrete, inflicting a relatively severe injury. *Id.*

Indeed, we have previously concluded that a prisoner raised a genuine dispute of material fact regarding his Eighth Amendment claim even when the prisoner's movements gave an officer more cause for alarm than Nash's movement did here. In *Cordell*, a corrections officer placed a prisoner in handcuffs and began escorting him to another area of a jail. 759 F.3d at 577. The officer held the prisoner in an "escort position," with the prisoner's hands held behind his back and upwards, towards his shoulders. *Id.* The prisoner alleged that as he and the officer proceeded, the officer began pushing him from behind to force him to move faster. *Id.* So the prisoner tried to turn around and face the officer to see what the officer was doing. *Id.* In response, the officer rammed the prisoner head-first into a wall with significant force. *Id.* at 577–78.

Although we acknowledged that the prisoner's attempt to turn and face the officer justified some amount of force, considering that "prison officials may use appropriate force to regain control of an aggressive inmate," we nonetheless held that the prisoner had raised a genuine dispute of material fact regarding the subjective component of his Eighth Amendment claim. *Id.* at 581. We first noted the "severity" of the prisoner's injuries, which included whiplash and a laceration that required stitches. *Id.* at 582–83. Next, we emphasized that, at the time of the use of force, the extent of the threat posed by the prisoner was minimal, considering that he was in a "submission hold," with his arms "cuffed behind his back." *Id.* at 583. We elaborated: "It is hard to understand—even being deferential to [the officer's] split-second judgment—how a prisoner in such an incapacitated position would present a sufficient threat to justify the extreme use of force" that the prisoner had accused the officer of using. *Id.*

Here, construing the record in the light most favorable to Nash, Nash's movements before Bryce's and Turner's takedown presented less cause for concern than the more aggressive and noncooperative actions of the prisoner in *Cordell*. Nash only slightly readjusted his arms. And, like the prisoner in *Cordell*, Nash was handcuffed and in a submission hold, with his arms being securely held up by Bryce and Turner, at the time Bryce and Turner chose to take him to the cement. As in *Cordell*, then, it is difficult to understand how Nash could have presented a

"sufficient threat" to justify Bryce's and Turner's choice to take him forcefully to the cement, even with deference given to the officers' "split-second judgment." *Id.*

Bryce's and Turner's attempts to distinguish *Cordell* are unpersuasive. Bryce and Turner emphasize that, at the time of the takedown, Nash was outside in a prison yard filled with other inmates, not in a hallway occupied only by other corrections officers. *See id.* at 583. True enough, the "extent of the threat to the safety of staff and inmates," *Whitley*, 475 U.S. at 321, might indeed be higher where a prisoner is in the vicinity of other inmates. But it does not follow that Bryce's and Turner's use of force was therefore so plainly reasonable as to warrant summary judgment in their favor. For one thing, although Nash was outdoors in the general vicinity of other prisoners, the video reflects that all the prisoners were a considerable distance away. For another, Nash's movement that triggered the takedown was slight. A reasonable jury could conclude that the mere fact of being in a prison yard does not justify exerting significant force against a prisoner who makes a minor movement.

Bryce and Turner next argue that, unlike in *Cordell*, there is no clear evidence that either officer was upset or agitated at the time he chose to take Nash to the ground. *See Cordell*, 759 F.3d at 584 (noting that the officer was "aggressive" to the prisoner before the use of force and remained "agitated" afterward). We have never held, however, that such clear evidence of the required mental state is necessary or dispositive. *Cf. Whitley*, 475 U.S. at 321 (noting that the court can draw "inferences" regarding an officer's mental state based on several factors). In any event, this case is not devoid of clear evidence suggesting that Bryce or Turner had a sufficiently culpable mental state. Turner testified that Nash had been swearing at Bryce and Turner as they walked him through the prison and that Bryce had been "visibly upset" by Nash's behavior just prior to taking Nash down. Turner Dep., R. 36-3, PageID 353. Turner further commented that he and Bryce had decided to use force against Nash in part *because* they were outside and in front of other inmates, explaining that he and Bryce did not want to "g[ive] off the impression that [they were] weak, [they] let anybody do what they want." *Id.* at PageID 381–82. A reasonable jury could infer from these comments that the takedown of Nash might have stemmed from something other than purely an attempt to use "appropriate force to regain control of an aggressive inmate." *Cordell*, 759 F.3d at 581.

We accordingly hold that Nash has raised a genuine dispute of material fact regarding the subjective component of his Eighth Amendment claim.

### 2.      Objective Component

We turn next to the objective component of Nash's Eighth Amendment claim. This component requires us to ask if Nash has raised a genuine dispute of material fact as to whether "the pain inflicted" by Bryce and Turner was "sufficiently serious." *Id.* at 580 (citation omitted). This component is "contextual and responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

Nash has raised a genuine dispute of material fact regarding the objective prong of his Eighth Amendment claim. The record shows that Bryce and Turner took Nash to the cement with force sufficient to fracture his foot in two places, requiring him to wear a cast for several weeks. A reasonable jury could conclude, based on the extent of Nash's injuries, that the pain inflicted by Bryce and Turner was "sufficiently serious." *Cordell*, 759 F.3d at 585; *see also id.* at 586 (noting that the objective component was satisfied where the prisoner suffered "rather significant injuries"); *Griffin*, 604 F.3d at 954 (concluding that the objective component was satisfied where the prisoner had "suffered serious pain").

### B.      Clearly Established Right

To overcome the defendants' qualified immunity defense, Nash ordinarily would need to show that it was "clearly established" in April 2021 that the defendants' use of force would violate his Eighth Amendment rights. *Mercer v. Athens County*, 72 F.4th 152, 164 (6th Cir. 2023). For a constitutional right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Burwell v. City of Lansing*, 7 F.4th 456, 476 (6th Cir. 2021) (citation omitted).

We need not determine whether Nash's Eighth Amendment rights were clearly established at the time of Bryce and Turner's use of force, however, because the defendants have forfeited the clearly established prong of their qualified immunity defense. Bryce and Turner did not raise any argument whatsoever, either in their summary judgment briefing in the district

court or in their answering brief on appeal, as to the clearly established prong, instead focusing entirely on the question of whether Nash had shown a violation of his constitutional rights. We accordingly hold that Bryce and Turner have forfeited the clearly established prong of their qualified immunity defense by failing to meaningfully contest the issue. *See, e.g.*, *Cockrun v. Berrien County*, 101 F.4th 416, 419–20 (6th Cir. 2024) (concluding that the defendants had forfeited qualified immunity by mentioning the defense in their summary judgment briefing only "in a perfunctory manner"); *Watkins v. Healy*, 986 F.3d 648, 666 (6th Cir. 2021) (explaining that because the defendant "failed to raise a qualified-immunity argument to the district court or in his brief" on appeal, he had "thus forfeited the issue"); *Ashford v. Univ. of Mich.*, 89 F.4th 960, 975 (6th Cir. 2024) (holding that considering the defendants' "scant treatment" of the clearly-established prong of qualified immunity, the defendants "forfeited the argument that our precedent had not clearly established" the plaintiffs' constitutional rights).[10]

## CONCLUSION

For all the reasons stated above, we reverse the district court's order granting the defendants' motion for summary judgment and remand this case for further proceedings consistent with this opinion.

---

[10]Contrary to the dissent's logic, our conclusion that Bryce and Turner have forfeited the clearly established prong of their qualified immunity argument is not at odds with our resolution of Nash's arguments regarding whether the findings from the Michigan major misconduct hearing should have preclusive effect on this litigation. Regarding preclusion, Nash provided arguments in his brief on appeal that were themselves sufficient to conclude that preclusion is inappropriate. *See supra* n.4. Bryce and Turner have provided no argument regarding the clearly established prong of qualified immunity at all.

———————————

**DISSENT**

———————————

READLER, Circuit Judge, dissenting. Taken at face value, this is not a difficult case. Following a timely review of the events at hand, an administrative law judge found that inmate Brent James Nash improperly resisted and pulled away from two prison officers as the officers escorted Nash toward a housing unit door leading to the prison yard. On that basis, the ALJ found Nash guilty of assault and battery of a staff member. In subsequent federal litigation, a magistrate judge honored that finding, as did the district court judge when reviewing the magistrate judge's decision. And if Nash resisted the officers, as these jurists concluded, all of us seem to agree that the officers were entitled to regain control over him, including by taking him to the ground. Maj. Op. 27–28.

Yet the majority opinion ultimately denies the officers qualified immunity. In undoing the good work of all three tribunals to have considered Nash's case, the majority opinion commits two fundamental errors. One, it embraces arguments Nash never made—points that, even had Nash raised them himself, in the end are at odds with the law and the record. Two, it fails to honor our decision in *Peterson v. Johnson*, 714 F.3d 905 (6th Cir. 2013), which otherwise easily resolves today's case. Contrary to the majority opinion, I would affirm the district court.

A. The facts necessary to resolve this appeal are not in dispute. Nash assaulted a fellow inmate in the prison cafeteria. Officers Austin Bryce and Calvin Turner intervened, taking Nash to the ground. After a brief struggle, the officers placed handcuffs on Nash. The officers then escorted Nash out of the cafeteria. With Nash in hand, the officers traveled along a hallway that led to the housing unit's front door, which opened into the prison yard where other inmates were present. Purportedly because Nash began pulling away from their hold, the officers lost their grip on Nash. That prompted the officers to initiate a takedown. In the process, Nash fractured his ankle in two places.

Nash's conduct resulted in him being issued a violation for Class I Major Misconduct. The violation consisted of two underlying charges, one for assaulting a prisoner in the cafeteria, and, relevant here, another for assaulting a staff member near the housing unit door. *See* Class I Misconduct Hr'g Rep., R. 36-4, PageID 397.

Given the severity of Nash's misconduct, Bryce prepared a written "Misconduct Report" detailing the specific allegations underlying the respective charges.

| Prisoner Number: 406338 | Prisoner Name: NASH | | | Facility Code: SLF | Lock: 6-202T | Violation Date: 4/29/2021 |
|---|---|---|---|---|---|---|
| Time and Place of Violation: 1737 Housing Unit 6 front door entrance | | | Contraband Removal Record Provided to Prisoner? ☐ Yes  Date         ☒ N/A | | | |
| Misconduct Class: ☒ I  ☐ II  ☐ III | | Charge(s): Assault (Prisoner Victim) Assault and Battery (Staff Victim) AND BATTERY —ms | | | | |

Describe Violation (If contraband involved, describe in detail; identify any other employee witnesses):
At 1735 while running dinner chow lines in Housing Unit 6, Prisoner Nash 406338 assaulted Prisoner Brown 932229 in the back of the head with a food tray on the A-wing base. After placing handcuffs on prisoner Nash 406338, Officer Turner and I were escorting Prisoner Nash 406338 to Housing Unit 7. At 1737 hrs Prisoner Nash 406338 began actively resisting and lunged away from me at the Housing Unit 6 front door entrance. I placed prisoner Nash 406338 on the ground to gain compliance. Prisoner Nash began compling with commands, Officer Turner and I then stood Prisoner Nash 406338 up and escorted him to Housing Unit 7 with no further incident.

Prisoner Nash 406338 Identified by MDOC Identification card and Otis facesheet

COPIED

| Reporting Staff Member's Name (Print) Officer Bryce 1124338 | Reporting Staff Member's Signature | Date and Time Written 04/29/22 2008 |
|---|---|---|

*Id.*; *see* Mich. Dep't of Corr., *Policy Directive 03-03-105, Prisoner Discipline* (2018), at 1, https://perma.cc/U5ZA-PXAX [hereinafter *Policy Directive 03-03-105*] ("A Misconduct Report shall be written if the behavior constitutes a non-bondable Class I misconduct."). In the section titled "Describe Violation," the report described two distinct violations, occurring at different points in time. First, the charging document alleged that at "1735" hours, Nash assaulted a prisoner in the cafeteria by hitting the prisoner with a food tray. Class I Misconduct Hr'g Rep., R. 36-4, PageID 397. Two minutes later, at "1737" hours, Nash, having been removed from the cafeteria, then assaulted a staff member. *Id.* As Bryce and Turner "were escorting Prisoner Nash 406338 to Housing Unit 7," Nash "began actively resisting and lung[ing] away from [Bryce] at the Housing Unit 6 front door entrance." *Id.* Bryce "placed" Nash "on the ground to gain compliance." *Id.* Upon being stood up, Nash was "escorted . . . to Housing Unit 7 with no further incident." *Id.* The report, in short, was precise in its allegations regarding the two assault charges against Nash: The first involved assaulting a prisoner in the cafeteria, and the second

involved assaulting an officer as Nash resisted the officer near the front door to Unit 6. *Id.*; *see also id.* at PageID 418 (defining "[a]ssault and [b]attery" of staff as any "physical resistance or physical interference with an employee").

Before the charging document was finalized, it was evaluated by a reviewing officer to verify its scope and nature. *Id.* at PageID 397; *Policy Directive 03-03-105*, *supra*, at 7 ("If the reviewing officer determines a Misconduct Report is not appropriate or not properly written, s/he may return the report to the staff member who wrote it for rewriting."); *id.* at 8 (stating that the review "shall include . . . [e]xamining the Misconduct Report to determine that the charge is appropriate"). Nash was given a copy of the document prior to his hearing. Class I Misconduct Hr'g Rep., R. 36-4, PageID 397; *see also Policy Directive 03-03-105*, *supra*, at 3 (explaining that a "[p]risoner receives a copy of the misconduct report after review is complete"). He later pleaded not guilty to the charges. Class I Misconduct Hr'g Rep., R. 36-4, PageID 393.

Issuance of the misconduct report triggered a mandatory hearing deadline. *See Policy Directive 03-03-105*, *supra*, at 5 ("[T]he hearing shall be conducted within 14 business days."). Consistent with that deadline, Nash, representing himself, contested the two charges during a timely hearing before an ALJ. Class I Misconduct Hr'g Rep., R. 36-4, PageID 393. There, the ALJ considered several pieces of evidence, including a report from a hearing investigator, prison video of the incident, video stills, and statements from both Bryce and Nash. *Id.* With respect to the staff assault charge in particular, Bryce, in line with the charging document, indicated that Nash had "actively resisted and lunged away from the escorting officers" near the housing unit door. *Id.* at PageID 396. Specifically, Bryce explained, as Nash was being "escorted from the unit" and out the door, he "lunged away from the officers." *Id.* at PageID 395. The ALJ also received and reviewed video and video stills of the events at the unit door. *Id.* at PageID 393, 408–09. At the hearing's close, the ALJ, in resolving the staff assault charge, found that Nash, while heading toward the unit door, "resist[ed] by pulling away, walking side to side, and then turning around towards the escorting officers," at which point the officers took him to the ground. *Id.* at PageID 396. These actions, the ALJ concluded, "interfered with the officers' attempts to . . . escort him from the unit." *Id.* Accordingly, Nash was found guilty of the

charged offense.  *Id.* ("The charge is upheld.").  The ALJ also found Nash guilty of the separate charge of assaulting a prisoner.  *Id.*

| | FINDINGS | | | | |
|---|---|---|---|---|---|
| Charge No. 1 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 007 |
| Charge No. 2 | ☒ Guilty | ☐ Not Guilty | ☐ Dismissed | Reporting Code | 008 |

*Id.* at PageID 393; *see also id.* at PageID 418 (Describing Class I Misconduct violations for assault on a prisoner as using reporting code "007" and assault on staff as using code "008").  Nash did not appeal this decision, either within the prison or to state court.  *See* Mich. Comp. Laws §§ 791.254, 791.255; Maj. Op. 7.

Turn now to federal court, where these same findings would again take center stage.  With the assistance of counsel, Nash sued the officers for excessive force tied to the injuries he suffered after being taken to the ground by the housing unit door leading to the prison yard.  The officers asserted qualified immunity, noting the ALJ's findings that Nash had "resisted" and "interfered with" the officers near the unit door, thereby justifying their actions.  Giving these findings preclusive effect, the magistrate judge rejected Nash's excessive force claims.  *See* R. & R., R. 39, PageID 438; *see also id.* at PageID 447 ("After considering the fairness of the misconduct hearing here and the accuracy of the factual findings from that hearing, the Court agrees with defendants that Nash should not be allowed to relitigate whether he resisted defendants.").  Reviewing that decision, the district court judge similarly referenced the administrative record and the ALJ's conclusions in rejecting Nash's contention "that the ALJ's findings are not supported by the evidence."  Order, R. 42, PageID 712; *see also id.* (emphasizing "the ALJ's findings that [Nash] '. . . pulled away from, and turned towards, the officers and the officers had to place him on the ground to gain control of him'" near the housing unit door).

1.  We are bound by the ALJ's findings.  As we have explained, factual findings from Michigan's major-misconduct hearings customarily are entitled to preclusive effect in federal court.  *Peterson v. Johnson*, 714 F.3d 905, 908 (6th Cir. 2013).  That is so when, as in *Peterson*, the administrative proceeding at issue satisfies the requirements laid out in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986).  These include (1) whether the state agency acted in a

judicial capacity; (2) whether the hearing officer resolved a disputed issue of fact properly before him; and (3) whether the party had an adequate opportunity to litigate the factual dispute. *Peterson*, 714 F.3d at 912–14 (citing *Elliott*, 478 U.S. at 799). If those requirements are met, we give the administrative finding the same preclusive effect it would be afforded by Michigan courts. And Michigan courts, for their part, afford agency factfinding preclusive effect when "the parties had a full and fair opportunity to litigate the issue," and where "a question of fact essential to the judgment was actually litigated" and decided. *Id.* at 914. Deeming all factors satisfied, we agreed in *Peterson* that the ALJ's factual findings there precluded "a contrary finding in federal court." *Id.* at 917.

Given its deep significance to resolving Nash's case, the similarities between *Peterson* and today's dispute bear particular emphasis. In *Peterson*, a Michigan prisoner (Peterson) allegedly assaulted an officer by pulling the officer's hand inside a prison cell, putting it at risk of being crushed by the cell door. *Id.* at 914. In response, prison officers initiated a takedown, injuring Peterson in the process. *Id.* at 908. The incident was captured on video. *Id.* at 909. Due to this conduct, Peterson was charged with assault on a staff member and subjected to a major misconduct hearing. *Id.* at 908. At the hearing, Peterson contested the charge, claiming that the officer instigated the contact as an excuse to abuse Peterson. *Id.* at 909–10. Peterson also reviewed "the evidence against him" save for the video, which was marked confidential for prison safety reasons. *Id.* at 909. At the conclusion of the hearing the ALJ, relying heavily on the video, determined that Peterson instigated the incident by grabbing the officer's hand and, accordingly, found Peterson guilty of assault. *Id.* Later, Peterson brought a § 1983 claim, asserting that the officers violated his Eighth Amendment rights when they took him down without justification. *Id.* at 908. Again, he claimed officers instigated the attack. *Id.* Yet we concluded that Peterson was not free to relitigate this point, as he was bound by the ALJ's findings. *Id.* at 917. In doing so, we first noted that the ALJ acted in a judicial capacity by resolving the dispute and issuing a decision that could be appealed to state court. *Id.* at 912. Next, we explained that Peterson was afforded a plethora of statutory protections, ensuring that he had an adequate opportunity to litigate. *Id.* at 913. Finally, we determined that Michigan courts would likewise afford the ALJ's findings preclusive effect. *Id.* at 917.

Nash's case mirrors *Peterson* in every legally significant way, including the fact that both prisoners were subjected to the same Michigan inmate disciplinary scheme. That is not my conclusion alone. At oral argument, it bears emphasizing, Nash's counsel agreed that "*Peterson* is very similar" to the case at hand. Oral Arg. Tr. 7:01. In light of *Peterson*, a "very similar" precedent, we must similarly give preclusive effect to the ALJ's finding that Nash resisted the officers near the housing unit door. *See Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) (noting "the basic principle of justice that like cases should be decided alike").

Turn then to the *Peterson* framework as applied to Nash's case. With respect to *Peterson*'s first two preclusion factors, which largely encompass Michigan's second factor, all agree that the ALJ here "acted in a judicial capacity" by considering record evidence, allowing the parties to be heard, and issuing a decision that Nash could have appealed in state court. *Peterson*, 714 F.3d at 912; Maj. Op. 10. And, notably, like the ALJ in *Peterson*, Nash's ALJ resolved the factual dispute by finding that Nash resisted the officers. *See Peterson*, 714 F.3d at 913; Maj. Op. 7.

That leaves the third *Peterson* factor, which overlaps with Michigan's remaining factor— whether Nash "had an adequate" (or, in Michigan's phrasing, "full and fair") "'opportunity to litigate' the factual dispute." *Peterson*, 714 F.3d at 913 (quotation omitted); *Monat v. State Farm Ins. Co.*, 677 N.W.2d 843, 845 (Mich. 2004). He did. To begin, Nash was afforded the same "plethora of statutory protections" as Peterson, including the opportunity to present evidence, submit written arguments, use rebuttal evidence to counter the evidence presented against him, and examine witnesses via questions submitted to the hearing officer. *Peterson*, 714 F.3d at 912; *see also* Mich. Comp. Laws § 791.252(a), (b), (d), (e). On top of that, Nash (like Peterson) retained the ability to appeal the ALJ's decision within the agency, and, if needed, to state court. *See* Mich. Comp. Laws §§ 791.254, 791.255. Together, these protections fairly ensured he had a full and fair opportunity to litigate the issue. *Peterson*, 714 F.3d at 913; *id.* at 912 ("[T]here is a whole raft of judicial-type protections available to Michigan prisoners in major misconduct hearings."). And Nash, understandably, was sufficiently motivated to do so. *See Monat*, 677 N.W.2d at 847 (discussing that a "full and fair opportunity to litigate" includes having "sufficient incentive" to contest the issue). As in *Peterson*, Nash faced discipline and

sanctions if found guilty of the charge. Class I Misconduct Hr'g Rep., R. 36-4, PageID 393. A finding that he committed the offense would result in the loss of privileges and detention. *See Policy Directive 03-03-105*, *supra*, at 20 (describing discipline for a Class I Misconduct offense); Class I Misconduct Hr'g Rep., R. 36-4, PageID 393 (finding Nash guilty and sentencing him to loss of privileges for forty-six days and twenty days of detention). That stark reality in conjunction with other available information plainly gave Nash, like Peterson, an "incentive to vigorously contest" the charge he faced. *Peterson*, 714 F.3d at 915 (holding that a prisoner "had incentive to vigorously contest [the Officer's] account" because "losing the argument could mean . . . thirty days of detention").

And, like Peterson, contest he did. Before the hearing, Nash was provided a copy of the misconduct report, which, again, served as the charging document for the alleged Class I Major Misconduct Violations—assaulting a prisoner, and, separately, assaulting a staff member. Class I Misconduct Hr'g Rep., R. 36-4, PageID 397. With respect to the staff member assault charge, the report indicated that Nash resisted officers "at the Housing Unit 6 front door entrance" leading to the prison yard. *Id.* He pleaded not guilty to both charges. *Id.* at PageID 393. At his hearing, Nash was given an opportunity to review much of the evidence and, in turn, made a statement himself. As to the staff misconduct charge, Nash explained to the ALJ that he "d[id not] [know] how [he] was supposed to pull away from [the officers]" near the unit door because his ankle was already broken. *Id.* at PageID 396; *see also Peterson*, 714 F.3d at 915 (affording preclusive effect to ALJ's fact finding on issue contested by prisoner). But the ALJ concluded that Nash's explanation was "not credible." Class I Misconduct Hr'g Rep., R. 36-4, PageID 396. Instead, the ALJ "upheld" the charge against Nash for resisting the officers at the unit door. *Id.* (upholding charge for "ASSAULT AND BATTERY (Staff Victim)"). The ALJ did the same for the prisoner assault charge. *Id.* at PageID 395–96 (upholding charge for "ASSAULT AND BATTERY (Prisoner Victim)"); *see also id.* at PageID 393 (finding Nash guilty of "Charge No. 1" corresponding to "Reporting Code 007" and guilty of "Charge No. 2," "Reporting Code 008"); *id.* at PageID 418 (explaining a charge for assault on a prisoner uses reporting code "007" and assault on staff uses code "008").

Against this backdrop, it becomes evident that a Michigan court would grant preclusive effect to the ALJ's findings that Nash resisted the officers while being escorted near the unit door. We too must respect that jurist's firsthand conclusions and afford them preclusive effect today, as we did in *Peterson*. *See, e.g.*, *Peterson*, 714 F.3d at 914 (giving preclusive effect to ALJ finding "that [the prisoner] grabbed [the officer's] hand and put it in danger of being crushed" because "this charge was submitted to the hearing officer for resolution, and it was resolved").

2. The majority opinion sees things otherwise. To its mind, Michigan courts would not afford the ALJ's factfinding preclusive effect because Nash lacked "a full and fair opportunity" to litigate the issues. Maj. Op. 12. That is so, the majority opinion says, for three distinct reasons. One, Nash was denied access to certain pieces of evidence. *Id.* at 14. Two, Nash lacked counsel during his administrative hearing. *Id.* at 19. And three, Nash "lacked sufficient incentives to litigate" whether he resisted the officers near the unit door. *Id.* at 16. As measured by *Peterson*, each argument fails.

a. Begin with the majority opinion's first assertion: that Nash lacked a full and fair opportunity to litigate because "he was 'not provided an opportunity to review any of the evidence relied on' by the hearing officer." Maj. Op. 12 (quoting Appellant Br. 44). This is a difficult basis upon which to deny preclusive effect to the ALJ's findings when, as the record reveals, Nash never requested that evidence before his hearing. The ALJ's report, prepared at the close of Nash's hearing, explains that "Nash did not request . . . witnesses[] or documents [to] review." Class I Misconduct Hr'g Rep., R. 36-4, PageID 393. Nash cannot complain now about the lack of access to evidence that he did not seek to begin with. *See Peterson*, 714 F.3d at 916. The majority opinion attempts to refute this conclusion by pointing to an undated letter from Nash, in which he acknowledged that he had "received [the] misconduct report" and then asserted that he "would like ALL evidence." Class I Misconduct Hr'g Rep., R. 36-4, PageID 394. But the undisputed evidence at summary judgment shows this letter was sent after his hearing. That fact is confirmed twice over, once by the ALJ's statement that Nash made no such pre-hearing request, and again by the letter's request for evidence that had not been marked confidential at the hearing. *Id.* at PageID 393; *id.* at PageID 394 (requesting exhibits "Not

Marked confidential"). And, needless to say, the absence of evidence on when the letter was sent cannot create a genuine dispute of material fact. *See Feagin v. Mansfield Police Dep't*, --- F.4th ---, 2025 WL 2621665, at *8 (6th Cir. Sept. 11, 2025).

Even then, despite Nash's failure to request evidence, the ALJ nevertheless reviewed the record with Nash before the hearing commenced. Class I Misconduct Hr'g Rep., R. 36-4, PageID 393 (noting that the "Misconduct Report [was] Read to and Discussed with Prisoner" and that the "Hearing Investigation [was] Read to and Discussed with Prisoner"). As a factual matter, it follows, Nash was not barred from reviewing "any of the evidence relied on by the hearing officer," as the majority opinion leads one to believe. Maj. Op. 12.

True, the video of the incident at issue was marked confidential due to security concerns, meaning, as in *Peterson*, Nash did not review it. Class I Misconduct Hr'g Rep., R. 36-4, PageID 395; *id.* (explaining that video recordings were marked confidential "for facility safety and security and to avoid disclosure of camera locations and capabilities"). And perhaps, as the majority opinion surmises, the video recordings were "arguably the most crucial pieces of evidence underlying the dispute." Maj. Op. 13. Yet as a matter of settled precedent, a lack of access to video recordings could not, as a matter of law, deprive Nash of a "full and fair opportunity to litigate." *Peterson*, 714 F.3d at 916–17. Again, in *Peterson*, video captured Peterson assaulting an officer by pulling the officer's hand inside a prison cell, putting it at risk of being crushed by the cell door. *Id.* at 914. Like Nash, Peterson was charged with assault on a staff member and subjected to a major misconduct hearing. *Id.* at 908. At the hearing, however, the video footage was marked confidential in light of prison security concerns, meaning Peterson was unable to review it. *Id.* at 909 (explaining the video was deemed confidential because of a concern that allowing the video's "actual viewing would reveal the limitations and capabilities" of the device). Based almost exclusively on the weight of the video evidence, the ALJ found Peterson guilty of assaulting the guard. *Id.* Yet even without access to this critical video, we held that Peterson had a fair chance to contest the matter, and, in turn, afforded the ALJ's findings preclusive effect. *Id.* at 916–17. The same should be true here.

Despite the plain similarities between these two cases, the majority opinion portrays "the limitations on Nash's access to evidence [as] *substantially greater* than those on" Peterson. Maj. Op. 14 (emphasis added). But those differences, the majority opinion later explains, boil down to the fact that in *Peterson*, unlike here, the inmate was provided a written time-stamped log of what was on the video and, in addition, had the ALJ verbally describe the video's contents. Maj. Op. 14–15; *see also Peterson*, 714 F.3d at 909. But this distinction lacks any legal significance. In *Peterson*, it bears noting, the panel observed the video log's existence only in its discussion of the facts. That background observation was neither mentioned in, nor a basis for, the panel's legal analysis and conclusion that Peterson had a "full and fair opportunity to litigate" the matter. Rather, *Peterson* turned on the broad statutory protections afforded to prisoners in this disciplinary setting, including the ability to appeal to state court. *Peterson*, 714 F.3d at 915–16. Nash received these same protections. *See generally* Mich. Comp. Laws § 791.252. Just as in *Peterson*, Nash "was entitled to raise [his evidentiary] concerns in an appeal to state court and, if the state court[] . . . failed to resolve his concerns, to appeal to the U.S. Supreme Court." *Peterson*, 714 F.3d at 916. And, critically, had Nash taken advantage of these opportunities, the "state court would have automatically made the video part of the record." *Id.* It follows that Nash's "failure to use those procedures," as in *Peterson*, cannot "be considered proof that the procedures themselves were somehow inadequate." *Id.* At bottom, if Nash had concerns about what evidence he was given, "this is not the forum in which to first bring those complaints." *Id.*

This holding, and not *Peterson*'s fact section, is what directs us here. An observation (like the existence of a timestamped log in *Peterson*) "that does *nothing* to determine the outcome . . . has no binding force." *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019). Put another way, controlling caselaw may not be swept aside merely because legally immaterial factual distinctions exist. *See Gonzales v. Raich*, 545 U.S. 1, 20 (2005) (explaining that when a fact did not "play any role in the Court's analysis" in an earlier case, attempts to distinguish the case on that basis "do[es] not diminish the precedential force" of the prior case); *Graves v. Malone*, 810 F. App'x 414, 424 (6th Cir. 2020) (explaining that minor "factual distinctions between . . . cases do not alter the certainty about the law . . . ." (quotation omitted)).

Seizing on our later decision in *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), as does the majority opinion, makes little difference.  Maj. Op. 14–16.  Just as "[o]ne panel of this court may not overrule the decision of another panel," *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017), neither can *Roberson*'s gloss on *Peterson*'s facts alter in the slightest how *Peterson* was actually decided, let alone its controlling force.  Nor, in any event, would the application of *Roberson* lead to a different result here.  True, *Roberson*, noted that Peterson had access to a time-stamped description of the video.  770 F.3d at 404.  Yet *Roberson* still recognized that Peterson was given an adequate opportunity to litigate due to the "plethora of statutory protections" afforded to prisoners, the same protections afforded Nash.  *Id.* (quoting *Peterson*, 714 F.3d at 913).

The majority opinion's reliance on *Roberson* is unavailing for other reasons too.  For one, *Roberson* barely touched on the preclusion issue and instead remanded the question for consideration by the district court, making no holding of its own.  *Id.* at 405.  For another, *Roberson* is a far cry from this case.  There, unlike here, the ALJ, among other unusual actions, "refused to review the alleged video of the incident" for herself.  *Id.*  We thus remanded the case to the district court to consider the propriety of that decision by the ALJ, as well as the "basis for [the ALJ's] factual findings."  *Id.*  Conspicuously absent from *Roberson*'s list of relevant considerations on remand was the *prisoner's* access to video evidence.  At day's end, because the facts before us closely resemble those in *Peterson* in all legally significant respects, our decision should follow suit.

With all other avenues closed, the majority opinion lastly takes refuge in its "sense of justice and equity."  Maj. Op. 16 (quoting *Roberson*, 770 F.3d at 405).  Rather than relying on one's idiosyncratic "sense" or obscure notions of "equity," I would instead follow binding precedent.  Any other approach would permit courts to flout binding case law based on little more than a whim, deeply undermining our system of precedent.  *See Thornburgh v. Abbott*, 490 U.S. 401, 427 (1989) (Stevens, J., concurring in part and dissenting in part) (explaining that the "casual discarding . . . of considered precedent ill serves the orderly development of law").  Regrettably, that is the exact tack employed by the majority opinion in disregarding *Peterson*.

b. Consider next the majority opinion's reliance on the fact that Nash lacked counsel during the administrative proceedings. That is an odd point to raise considering that Nash himself has never done so. Nash failed to complain about his lack of legal representation during his proceeding before the ALJ. *See generally* Class I Misconduct Hr'g Rep., R. 36-4. He did not do so in federal court before the magistrate judge, even with the assistance of counsel. Instead, he and his counsel focused exclusively on the validity of the ALJ's findings regarding the charge that he resisted officers near the unit door. Resp. Defs.' Mot. Summ. J., R. 36, PageID 200–02 (arguing that the ALJ's findings should not be given preclusive effect because they were inaccurate). Nor did he complain about his lack of counsel with the district court when, again with the benefit of counsel, he contested the magistrate judge's ruling against him. Obj. R. & R., R. 40, PageID 478–79 (same). Here too, Nash failed to mention the issue in either his briefing or during oral argument, where he and counsel focused instead on the fact that the ALJ's findings were not consistent with the evidence. Appellant Br. 43; *see also* Oral Arg. Tr. 0:01–12:22. Nash has thus forfeited the point. *See Joseph Forrester Trucking v. Dir., Off. of Workers' Comp. Programs*, 987 F.3d 581, 593 (6th Cir. 2021) (noting our practice of enforcing forfeiture at all three stages).

We cannot raise it on his behalf. "[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). In other words, no matter the theories we might conjure up on a party's behalf, the longstanding party presentation rule confines us to considering only the arguments raised, not those we could imagine. *See NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." (quotation omitted)). This settled principle has understandable justifications. It exists to preserve our fundamental nature as neutral arbiters. *See United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("[C]ourts are essentially passive instruments of governments. They do not, or should not, sally forth each day looking for wrongs to right." (citation and quotation omitted)). It ensures that the opposing party is on notice to respond to the issue, and that the district court has the chance to resolve it in the first instance. *See Gray v. State Farm Mut. Auto. Ins. Co.*, 145 F.4th 630, 651–52 (6th Cir. 2025)

(Readler, J., dissenting).  And it affords us the benefit of the parties' (and the district court's) views on an issue before pronouncing an outcome, which helps protect against the creation of accidental or mistaken law.  *Cf. Sineneng-Smith*, 590 U.S. at 376 (vacating and remanding a decision "for an adjudication of the appeal attuned to the case shaped by the parties rather than the case designed by the appeals panel").  After all, as each of us should recognize, a "dose of judicial humility requires acknowledging that even seemingly straightforward legal issues can have hidden wrinkles." *Su v. Med. Staffing of Am., LLC*, No. 22-1290, 2023 WL 3735221, at *5 (4th Cir. May 31, 2023) (Richardson, J., dissenting) (observing that "[a]ppellate courts acting sua sponte and without the benefits of the adversarial system can and do make serious errors" (quoting Ronald J. Offenkrantz & Aaron S. Lichter, *Sua Sponte Actions in the Appellate Courts: The "Gorilla Rule" Revisited*, 17 J. App. Prac. & Process 113, 129 (2016))); *see also Rhodes v. Stewart*, 488 U.S. 1, 5 (1988) (Marshall J., dissenting) (explaining that briefing of an issue "leads to greater accuracy in [the Court's] decisions" and serves to reduce "the inevitable incidence of error").

These longstanding limits on judicial power notwithstanding, the majority opinion deems the issue regarding lack of counsel at Nash's administrative hearing preserved simply because Nash, in his appellate brief, recited the "full and fair" prong articulated in *Peterson* before making a completely different argument about his inability to review video evidence.  Maj. Op. 12 n.4.  That Nash somehow preserved all possible "full and fair" arguments just by invoking threshold legal language is difficult to accept.  The majority opinion's understanding of our preservation requirement is at odds with how we have historically applied the principle, which requires that a party "argue or explain how that standard or those elements were satisfied" in their case.  *United States v. Kelso*, 468 F. App'x 551, 556 (6th Cir. 2012); *Orchano v. Advanced Recovery, Inc.*, 107 F.3d 94, 99 (2d Cir. 1997) ("[R]ecitation of the applicable . . . legal standard, standing alone, is normally not sufficient to permit appropriate appellate review.").  The rule has cemented itself for good reasons.  After all, employing the majority opinion's unprecedented approach would forgive forfeiture in virtually every case as to virtually any argument we might conceive, so long as a party has invoked a general legal principle.  *Contra Zakora v. Chrisman*, 44 F.4th 452, 466 (6th Cir. 2022) (reasoning that because the defendants "did not make any argument at all" as to the clearly established prong of qualified immunity in their brief on appeal,

but rather only cited the legal test, they had "forfeited the argument as an appellate issue"); *Courser v. Mich. House of Representatives*, 831 F. App'x 161, 182 (6th Cir. 2020) (holding that the "bare recitation" of the "elements of tortious interference with a business relationship" "is not enough to preserve [that] claim"). Imagine the mischief this rule invites. Under the majority opinion's logic, a defendant in a negligence action who merely recites negligence's four elements preserves the defenses of breach, causation, and damages even if he devoted the entirety of his litigation efforts on the argument that he did not owe the plaintiff a duty of care. In the end, a world rid of traditional preservation and notice requirements would allow a court to conjure up an argument on any legal issue at any time, all without the benefit of briefing from either side.

Even more problematic here is the fact that the majority opinion does not apply its newly framed rule evenly. On the one hand, the majority opinion penalizes the officers for "failing to meaningfully contest . . . the clearly established prong of their qualified immunity defense." Maj. Op. 29–30 (holding that the officers "forfeited the clearly established prong of their qualified immunity defense by failing to meaningfully contest the issue"). Yet on the other, it willfully overlooks Nash's failure to raise any objection regarding the absence of counsel. Maj. Op. 12 n.4. As both sides made equal efforts to raise their respective issues, I would treat them equally. *Compare* Appellant Br. 42 (reciting *Peterson*'s legal test, including the "full and fair" element, but raising unrelated arguments), *with* Appellee Br. 15 (reciting qualified immunity test, including the "clearly established" element, but raising unrelated arguments). Neutral principles, in other words, deserve neutral application. *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 644 (2016) (Alito, J., dissenting) ("As a court of law, we have an obligation to apply . . . rules in a neutral fashion in all cases, regardless of the subject of the suit.").

In any event, even had Nash made this argument, he would still come up short. To start, it seems that the lack of reliance on counsel during his administrative hearing may well have been Nash's own doing, considering that he did retain counsel to aid him in federal court. Notice of Appearance, R. 26, PageID 65; *see also* Mich. Dep't of Corr., *Policy Directive 05-03-116, Prisoner's Access to the Courts* (2021), at 1–4, https://perma.cc/ACU5-FXAE [hereinafter *Policy Directive 05-03-116*] (discussing a prisoner's access to counsel and not explicitly

precluding access to counsel at administrative hearings). Regardless, *Peterson* rejected the notion that the presence of counsel is necessary to a full and fair chance to litigate a disciplinary charge. 714 F.3d at 916. Rather, as we explained, Michigan courts deem "the presence of counsel" merely as supporting evidence that a prisoner enjoyed a full and fair opportunity to contest his charges. *Id.* Using different parlance, it may be considered a "plus factor" in the analysis. *Peterson*, 714 F.3d at 916. But it is not a requirement, nor is it a negative factor that weighs against a finding of a "full and fair" opportunity to litigate. As we said in *Peterson*, "[i]f counsel's participation were a categorical necessity, then it would have been listed among [Michigan's] . . . factors." *Id.* In short, that the assistance of counsel may aid the fairness of administrative hearings does not mean that the absence of counsel renders them unfair. *See NLRB v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J., concurring in the judgment) (explaining "the incorrect assumption that if P implies Q, then not-P implies not-Q").

Indeed, not only does the absence of representation not weigh against the "full and fair" analysis in this administrative setting, but also, as in *Peterson*, it would have made no difference here to the administrative proceeding's outcome. Back to *Peterson*, where we held that the prisoner's lack of legal representation did not merit a finding that the prisoner was denied a fair chance to litigate. Just as "the absence of counsel [was not] problematic" there, so too here. *Peterson*, 714 F.3d at 917. Both here and there, "the factual issue" needed to resolve the matter "was a very simple one" that, in Nash's case, framed in the words of *Peterson*, "turned on the [ALJ's] judgment of [Bryce's] and [Nash's] credibility and on his review of video recording[s]." *Id.*; *see also* Class I Misconduct Hr'g Rep., R. 36-4 at PageID 396 (looking only to the video, Nash's statement, and Bryce's report to conclude Nash was guilty of assaulting a staff member). As a result, counsel would have had at most only a "negligible influence on such a factual judgment" here. *Peterson*, 714 F.3d at 917.

On this point, I note, the majority opinion largely seems to agree. To its mind, counsel's contribution would have been merely to assist Nash in securing access to evidence he was unable to obtain himself. Maj. Op. 16–17. Yet even that seems to be overstating things. Michigan prison regulations make no provision whatsoever for confidential evidence to be disclosed to an attorney in lieu of a prisoner, as the majority opinion assumes would have occurred. To the

contrary, those provisions indicate that the ALJ "may deny access to the evidence to a party," which under any fair reading would include the party's counsel. Mich. Comp. Laws § 791.252(h); *cf. Policy Directive 05-03-116*, *supra*, at 1 (discussing that when prisons have access to counsel, counsel cannot "violate[] a [prison] policy directive or operating procedure" "or aid[] a prisoner" in doing so). Thus, it is little more than speculation to assert that counsel would have aided Nash in accessing the video. And, as *Peterson* emphasized, there would be "perverse consequences" if issue preclusion turned on the assistance of counsel: "[A] party who went to the effort and expense of hiring counsel to litigate a claim would face issue preclusion in a collateral proceeding, while a party who chose not to hire counsel could avoid preclusion and have his case live to be litigated another day before a different court." *Peterson*, 714 F.3d at 917.

In any event, as already discussed, Nash would have received that evidence had he appealed to state court. Mich. Comp. Laws § 791.253(2). By any measure, in other words, there was no complex legal issue that mandated the assistance of counsel, even if, contrary to *Peterson*, counsel was required.

\* \* \*

One final point bears mentioning. The majority opinion finds legal significance in the fact that, in its telling, Nash could not afford counsel at the administrative stage based on his commencing his federal litigation *in forma pauperis*. Maj. Op. 16 n.6. The record suggests otherwise. Again, Nash could and ultimately did retain counsel in the district court. And, it bears repeating, neither Nash nor his counsel ever asserted in federal court that Nash lacked the ability to retain counsel during his administrative proceedings, let alone that this limitation has any bearing on the preclusive nature of those proceedings. Only the majority opinion argues as much.

Rather than grappling with the particulars of this case, the majority opinion opts for a broader proposition—namely, that it can never be an indigent prisoner's "fault" that he failed to retain counsel for an administrative disciplinary proceeding and, further, that the resulting lack of counsel "points against any notion that [the prisoner] received a full and fair opportunity to litigate." Maj. Op. at 16 & n.6. Taking all of this together, the majority opinion functionally

deems Michigan's disciplinary scheme a legal nullity as to indigent prisoners unless the state provides them representation or, alternatively, an attorney would have operated as little more than a potted plant during the prisoner's administrative proceeding. *Id.* at 20 (declaring no preclusive effect if an attorney would have been "able to view" evidence or "make arguments" or "request[] more evidence"). That is a breathtaking use of preclusion rules, especially when one considers the many other settings where we routinely honor an adjudication even in the absence of counsel on all sides. *See Scott v. Illinois*, 440 U.S. 367, 373 (1979) (prosecution of misdemeanors where punishment is a fine or probation); *Pennsylvania v. Finley*, 481 U.S. 551, 555–57 (1987) (post-conviction relief); *Turner v. Rogers*, 564 U.S. 431, 448 (2011) (civil contempt proceedings where incarceration is possible). Tellingly, the majority opinion cites no authority for its unique suggestion. While I do not dispute that, as a general principle, access to counsel touches on important aspects of fairness, I would not loosely deploy those principles to upend a state's selected administrative disciplinary process, especially where no party has raised the question, and where no precedent seemingly supports the answer.

c. Finally, the majority opinion believes that Nash lacked a "sufficient incentive" to litigate whether he resisted at the unit door—conduct relating to the precise charge against him. *See Monat*, 677 N.W.2d at 847 (discussing that a "full and fair opportunity to litigate" includes having "sufficient incentive" to contest the issue). Why? Because, we are told, Nash "was guilty of [assault of a staff member] by virtue of having resisted Bryce, Turner, and other officers when they tried to handcuff him" in the cafeteria, before officers escorted him down the hallway to the unit door. Maj. Op. 17–18. It follows, says the majority opinion, that Nash had no incentive to contest whether he resisted officers near the unit door, as that finding would have had no bearing on his guilt. *Id.* at 18–19 (arguing that even if "Nash had successfully argued that he did not pull away from the guards . . . the hearing officer still would have found that Nash committed an assault earlier" in the cafeteria).

Here too, the majority opinion runs into a threshold barrier: Nash has never disputed his incentive to challenge before the ALJ allegations regarding his conduct near the housing unit door. He did not make such an argument before the magistrate judge. Resp. Defs.' Mot. Summ. J., R. 36, PageID 200–02 (arguing that ALJ's findings should not be given preclusive effect

because they were inaccurate).  Nor did he raise a "lack of incentive" argument with the district court.  Obj. R. & R., R. 40, PageID 478–79 (same).  It is thus perhaps no surprise that he likewise did not make this argument to us.  *See* Appellant Br. 41–45.  Again, because Nash made no mention of his supposed lack of incentive to litigate (other than the bare recitation of *Peterson*'s legal test), he has forfeited the issue.  *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) ("To preserve an argument, . . . the litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it.").

In any event, there is good reason why Nash never argued that events in the cafeteria discouraged him from contesting the allegations about his behavior near the unit door:  Nash's staff assault charge was tied *exclusively* to events near the unit door.  Class I Misconduct Hr'g Rep., R. 36-4, PageID 397.  Recall that the charging document that prompted Nash's disciplinary hearing specified that Nash's assault violation was for "actively resisting and lung[ing] away from [Bryce] at the Housing Unit 6 front door entrance."  *Id.*  Tellingly, the cafeteria was referenced only with respect to the prisoner assault charge.  And the conduct that gave rise to that charge, it bears emphasizing, occurred two minutes before the conduct at the housing unit door, which prompted the staff assault charge.  *Id.*  By its plain terms, in other words, Nash's charge for assaulting a staff member was solely linked to events near the unit door; it made no mention of the cafeteria.  That is why Nash, in responding to the staff assault charge before the ALJ, understandably focused exclusively on his behavior near the housing unit door.  *Id.* at PageID 396 ("I don't [know] how I was supposed to pull away from them when they broke my ankle.").

Both the magistrate judge and the district court understood the record this way.  *See* R. & R., R. 39, PageID 447–48 (noting the ALJ found that Nash resisted while officers escorted him near the unit door); Order, R. 42, PageID 711 (similar).  In affording the ALJ's findings preclusive effect, the magistrate judge's recitation of the relevant facts made no mention of Nash's conduct towards staff in the cafeteria.  R. & R., R. 39, PageID 448.  So too for the district court.  Order, R. 42, PageID 712.  And the majority opinion, it seems, agrees that the misconduct citation references only Nash's conduct near the unit door, and "not Nash's earlier resistance to the officers" in the cafeteria.  Maj. Op. 19.

Working backwards, the majority opinion nonetheless concludes that Nash's earlier conduct in the cafeteria must have been relevant to the staff assault charge because the ALJ mentioned it in his report. *See id.* at 24 ("If the only conduct relevant to Nash's assault charge was Nash's resistance in the few seconds before Bryce and Turner took him to the ground, much of the hearing officer's reasoning makes little sense."). This proposition, given with the luxury of hindsight, is a tough pill to swallow. Nash's incentive to litigate the charge against him, it should go without saying, is not judged based off of the hearing's result. *See* Restatement (Second) of Judgments § 28 cmt. j (A.L.I. 1982) ("[R]efusal to give the first judgment preclusive effect should not occur without a compelling showing of unfairness, nor should it be based simply on a conclusion that the first determination was patently erroneous.").

And, of course, Nash's initial charges cannot be amended by later fact finding, meaning Nash had all the reason in the world to respond to the initial charges. Consider just the constitutional ramifications of doing so. Viewing Nash as at risk of jeopardy for the uncharged purported staff assault in the cafeteria would run afoul of basic due process protections, given the absence of notice of the charges against him. *Wolff v. McDonnell*, 418 U.S. 539, 557, 564 (1974) (explaining that due process requires a prisoner be given notice of the charges against him to "give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact"); *Sessions v. Dimaya*, 584 U.S. 148, 177 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) ("[T]he most basic of due process's customary protections is the demand of fair notice. Criminal indictments at common law had to provide 'precise and sufficient certainty' about the charges involved." (quotation and citations omitted)); *Warnock v. Warden*, *FCI Ray Brook*, No. 22-10771, 2023 WL 3620868, at *3 (11th Cir. May 24, 2023) (per curiam) (identifying due process violation under *Wolff* when the "original charges varied from the sanctions [the prisoner] actually received" and remanding to the district court to consider the issue). That is why prisons in Michigan are required to ensure that a prisoner receives "advanced written notice of the charges at least 24 hours prior to the disciplinary hearing." *Tocco v. Marquette Prison Warden*, 333 N.W.2d 295, 297 (Mich. Ct. App. 1983); *see also Policy Directive 03-03-105*, *supra*, at 3.

The ALJ, of course, noted in passing that, before being taken out of the cafeteria and later being led to the housing unit door, Nash had to be restrained by officers. Class I Misconduct Hr'g Rep., R. 36-4, PageID 396; Maj. Op. 20. That observation is folded into the ALJ's broader narration of what was captured on the prison recording system. But, again, only the events at the unit door were the subject of the staff assault charge, events that, after being addressed by the ALJ, led the ALJ to conclude that "the charge is upheld." *Id.* at PageID 396; *see also Adams v. Gunnell*, 729 F.2d 362, 370–71 (5th Cir. 1984) (recognizing that a prison cannot charge an inmate for violating one prison rule but then punish him for "some other conduct" without running afoul of the Due Process Clause). Perhaps Nash could also have been charged for staff member assault stemming from the cafeteria incident (although it bears noting that Nash's conduct there seemingly did not include more serious instances of Nash lunging away from or turning his head at the officers). Either way, the fact remains that he was not so charged. *Cf. Peterson*, 714 F.3d at 914 (noting for issue preclusion to apply, Michigan courts ask if an issue has been "actually litigated," meaning "it must have been put into issue by the complaint," and holding that the factual question at issue was actually litigated because "the charge [the officer] made against Peterson was that Peterson grabbed his hand and put it in danger of being crushed, this charge was submitted to the hearing officer for resolution, and it was resolved"). As a result, any reference by the ALJ to Nash's activity in the cafeteria has no legal relevance here—it is simply background information that sets the stage for the main event. *Cf. Stirone v. United States*, 361 U.S. 212, 219 (1960) (recognizing the legal nullity of being convicted on a charge the "grand jury never made against him"). There is thus no reason to believe, as the majority opinion tepidly asserts, that the ALJ "appears to have understood" the charge against Nash as encompassing anything more than his behavior at the unit door. Maj. Op. 19.

In the end, the majority opinion frames these events backwards. Nash had no reason to litigate whether he violated any conduct rules in the cafeteria, as that was not the basis for his charge and disciplinary hearing. But there is little doubting that Nash had "sufficient incentive to litigate" the events near the housing unit door, the very subject of the hearing and the only conduct that he was informed was charged against him.

With *Peterson* as our guide, it is clear that Nash had a full and fair chance to litigate. We are thus bound by the ALJ's findings that Nash "actively resisted" the officers before he was taken down near the unit door. *Peterson*, 714 F.3d at 917.

\* \* \*

As the foregoing discussion reflects, *Peterson* makes this case an easy one. And as a published precedent, *Peterson* may not be cast aside. That is so even if we disagree with its reasoning, a sentiment that appears throughout the majority opinion. *See* Maj. Op. 17 n.7 (taking issue with the fact that *Peterson* held that a lack of counsel during a prisoner's misconduct hearing does not deprive a prisoner of a full and fair opportunity to litigate and calling for *Peterson* to be overruled on that basis); *id.* at 20 (arguing that Nash would have had a full and fair opportunity to litigate if he was represented by counsel); *id.* at 19 (arguing that lack of access to video denies a prisoner an adequate opportunity to litigate despite *Peterson*'s holding to the contrary). Precedent, in the end, is precedent, no matter how much we may dislike where it leads. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 455 (2015) (noting that adherence to prior precedent is a "foundation stone of the rule of law"); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("No matter how misguided this case law may be, it binds us.").

While that principle should be unassailable, it bears dwelling for a moment on why that is so. Honoring precedent brings predictability to the law and channels our decisionmaking, features, not bugs, of our system of adjudication. *Payne v. Tennessee*, 501 U.S. 808, 827–28 (1991) (explaining that stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles"). Both custom and rule require that we faithfully apply a published case's holding. *See Ferguson*, 868 F.3d at 515 ("One panel of this court may not overrule the decision of another panel; only the en banc court or the United States Supreme Court may overrule the prior panel."); *see also* 6th Cir. R. 32.1(b) ("A published opinion is overruled only by the court en banc."). But with en banc or Supreme Court review exceedingly rare, it is left to each panel to carry out this most-important tradition. In essence, then, this practice operates as something of an honor system; in deciding whether those marks have been met, we police ourselves.

Doing so in name only, however, is not enough. Indeed, it need not be said that "honoring stare decisis requires more than beating [a precedent] to a pulp," leaving it only "technically alive." *Hein v. Freedom from Religion Found, Inc.*, 551 U.S. 587, 636 (2007) (Scalia, J., concurring in the judgment). Yet today, that admonition has largely gone unheard.

B. When bound by the ALJ's factual findings, it becomes readily apparent that the officers did not engage in a constitutional violation. As a result, we must affirm the grant of summary judgment in their favor. *Cf. Peterson*, 714 F.3d at 918 (noting preclusion "includes only *factual* issues decided by a state agency," not legal conclusions).

Qualified immunity protects the officers from personal liability so long as they did not violate Nash's "clearly established" constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Nash thus bears the burden to show that "(1) the official violated his constitutional rights, and (2) at the time of the violation, it was clearly established that the officer's conduct would violate the Constitution." *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (quotation omitted).

We can resolve this case at the first step, as no constitutional violation occurred. For Nash to show that the officers' use of force violated his Eighth Amendment rights, he "must satisfy both an objective and a subjective component." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). The latter subjective component "focuses on the state of mind of the prison officials." *Id.* And on that score, the officers could have fairly believed that Nash's resistance imperiled their safety, justifying their actions.

In assessing the subjective prong, we distinguish between force used in a "good-faith effort to maintain or restore discipline," and force used "maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quotation omitted). To do so, we ask whether an officer's use of force "could plausibly have been thought necessary." *Whitley v. Albers*, 475 U.S. 312, 321 (1986). In making that determination, we consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to

them, and any efforts made to temper the severity of a forceful response." *Id.* (quotation marks omitted). All the while, we remain mindful that split-second decisions to use force are granted "wide-ranging deference." *Combs v. Wilkinson*, 315 F.3d 548, 557 (6th Cir. 2002) (quotation marks omitted).

Giving the ALJ's factual determinations preclusive effect, Nash pulled away from Bryce and Turner, causing them to lose their grip on him. This scenario understandably created an immediate safety concern. *See Burnett v. Griffith*, 33 F.4th 907, 912 (6th Cir. 2022) (holding a prisoner created an "immediate exigency by pulling away from" an officer's grasp and holding the officer was justified in taking him down). That fear was especially acute given that Nash's resistance occurred near the housing door in the prison yard, which was populated with other inmates. *See Whitley*, 475 U.S. at 321 (noting we consider "the extent of the threat to the safety of staff and inmates"). The officers therefore had a "plausible basis" to believe that Nash "constituted a threat who needed to be restrained under all the circumstances." *Johnson v. Sootsman*, 79 F.4th 608, 619 (6th Cir. 2023) (quotation omitted). Executing a takedown maneuver in that scenario was not a disproportionate amount of force. *See, e.g.*, *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014) ("[P]rison officials may use appropriate force to regain control of an aggressive inmate."); *Griffin v. Hardrick*, 604 F.3d 949, 952–53, 955 (6th Cir. 2010) (holding an officer was entitled to qualified immunity after using a "leg sweep" maneuver to regain control of a prisoner who was struggling against the officer's hold). Said differently, in view of the split-second nature of the officers' decision, they could plausibly have believed that force was necessary to mitigate a safety risk.

Because Nash cannot demonstrate that the "exclusive purpose [of the takedown was] to inflict pain," *Sootsman*, 79 F.4th at 621, he cannot show the officers violated his constitutional rights. Accordingly, qualified immunity was properly granted to the officers. On that basis, I would affirm the district court.